The Farrish Gravel Company, Inc. obtained a road building contract with the County Board of Supervisors of Panola County, Mississippi, to construct an asphalt road for a distance of approximately five and four-tenths (5.4) miles, known as the Essex-Curtis-Batesville Road. This contract specified that the road would be closed for through traffic, but would be maintained for local traffic. The authority to contract was made a part of the minutes of the Board of Supervisors on June 14, 1966.
Thereafter, on February 7, 1967, the appellants entered into a lease contract with a landowner to purchase gravel from a gravel pit located on land adjacent to and serviced by the Essex-Curtis-Batesville Road. The appellants and their associates were in the gravel hauling business. They owned and operated at least twenty or more gravel trucks and trailers capable of hauling from 9 to 14 yards of gravel, or 21 tons each load. They also owned and operated a dragline crane used in loading gravel trucks.
On June 7, 1968, the complainant, Farrish Gravel Company, filed a bill in the Chancery Court of Panola County, Mississippi seeking a temporary and a permanent injunction against the appellees, Ward Hudson, Bobbie Hudson, Billy Hudson and Emmett Davis (hereafter called Hudsons). The bill alleged that the defendants were seriously damaging the Essex-Curtis-Batesville Road by hauling gravel over the road then under construction. The bill alleged that the Hudsons refused to desist from destroying the road although the Farrish Gravel Company had often demanded that they quit hauling gravel over the road, and further alleged that such activity was causing irreparable damage to the road. Complainants said that since the Farrish Gravel Company had no adequate remedy at law, it was entitled to an injunction enjoining the Hudsons from further use of the road. The chancellor issued the injunction requested by the complainant.
Thereafter, on July 7, 1968, the respondents, the Hudsons, answered, denying the allegations of the bill of complaint and asking that the injunction be dissolved.
The Hudsons filed a cross-claim wherein they alleged that they were forced by the injunction to purchase gravel at other places at a higher cost, so that they were damaged in the sum of fifty-thousand dollars ($50,000.00) plus an attorney's fee of two thousand five hundred dollars ($2,500.00). The respondents denied that they had damaged the road and stated that they were hauling approximately ninety (90) loads per day on the date of the injunction. *Page 632 
They contended that they had a right to haul gravel on a public road which had not been closed to local traffic.
The case was heard in two parts: first, the motion to dissolve the injunction was heard and overruled, and the injunction made permanent, except by agreement of the parties certain weight loads of gravel were permitted to be hauled in certain trucks. The stenographer's notes were lost, and later it became necessary to prepare a bill of exceptions as to the procedure and testimony on the first hearing.
The Farrish Gravel Company was permitted to amend its original petition so as to demand damages to the road caused by the use of the road before the temporary injunction was issued.
The second hearing before the chancellor was based primarily upon the petition of the Farrish Gravel Company asking damages for the cost of repairs to the road alleged to have been caused by the Hudsons. The chancellor gave judgment against the defendants, Hudsons, in the sum of five thousand seven hundred dollars ($5,700.00).
The Hudsons contended during the trial, and now contend on appeal to this Court, that the chancellor should not have assumed jurisdiction of this case for the following reasons:
(1) The Farrish Gravel Company had adequate remedies at law without invoking the jurisdiction of the chancery court by the use of a writ of injunction.
(2) The project road was not closed to local traffic and they had as much right to use a public road as other individuals who were using the road.
They also contended that they did not damage the road more than other individuals who were permitted to use the road. Moreover, it is said that a private road contractor has no authority to sue for damages done to a public road, and this is especially true where the contractor had agreed to maintain the road for local traffic.
The appellants point out that the contract made between the county and the Farrish Gravel Company provided that the road would be closed to "through" traffic, but would be maintained for the use of "local" traffic or that detours would be provided for the traffic.
They called the trial court's attention to Section 8312, Mississippi Code 1942 Annotated (1956) which is as follows:
 "Whenever in the discretion of the board of supervisors of any county it seems proper so to do, the board may, by order on its minutes, authorize the commission of any road district within the county, or the engineer of such commission, to forbid the use of any hard surfaced road, or portion thereof, when under construction or repair; and the highway commission, or its engineer, when so authorized by the board of supervisors, may close said road, or any portion thereof, to travel by an obstruction placed thereon in such manner as to indicate its closing, or by a sign marked `closed by order of the highway commission.'" § 8312, Miss.Code 1942 Ann. (1956).
After careful consideration of the specific facts in this case, we have concluded that the temporary and permanent injunction issued by the chancery court was a proper exercise of the jurisdiction of the chancery court in the emergency situation shown by the testimony in this case to prevent a threatened nuisance, particularly since an agreement of the parties, permitting the Hudsons a limited use of the road, was incorporated into the decree. See Annot., 5 A.L.R. 768 (1920).
In reaching the conclusion that an injunction was proper, we are cognizant that the County Board of Supervisors has the discretionary authority to forbid the use of a road under construction, as above set forth in Section 8312, supra.
Moreover, the Board also has power to limit the weight load permitted to be hauled over the roads as will be hereafter shown.
The appellee, Farrish Gravel Company, charged in the original bill that the defendants were hauling excessive loads of *Page 633 
gravel over the unfinished road "causing considerable damage" and "irreparable injury". The defendants admitted that they were hauling 90 loads of gravel over the unfinished road daily. The chancellor concluded that one of defendant's trucks moved over the road every three minutes. The vice president of Farrish Gravel Company testified that they were unable to finish the road as long as the Hudsons hauled gravel over it. The president of Farrish Gravel Company said "Every time I could catch up with the defendants, I would ask them to stay off the road." He said "Each time we patched the road, the Defendants tore it up again, . . ." The county engineer testified that in his opinion, the contractor could not finish the road while the defendants Hudsons hauled over it. From the foregoing emergency situation, the contractor was entitled to injunctive relief to prevent irreparable injury to the road, so that it could proceed to finish the road, although it is also apparent that the contractor might have availed itself of legal remedies long before the emergency arose.
The chancery courts should be cautious in granting an injunction prohibiting the use of a public road to an individual except in emergency situations.
On the other hand, we are convinced that the appellee, Farrish Gravel Company, was not entitled to recover compensation for damages alleged to have been sustained by the Farrish Gravel Company incurred in repairing the project road east of the gravel pit road for three reasons: First — the Hudsons had a right to use the road so long as the road was open to local traffic and no weight limit was imposed upon the use of the road. Second — the Farrish Gravel Company acquiesced in the use of the road by the general public. Third — the damages charged to the appellants are speculative.
 I.
At the outset, it cannot be questioned that the public generally has an absolute right to use the public roads and highways in a customary and reasonable manner so long as they are not properly closed to public use by legislative sanction. Muse v. Mississippi State Highway Commission, 233 Miss. 694,103 So.2d 839 (1958); Hudson v. Stuart, 166 Miss. 339, 145 So. 611 (1933); Mayor, etc., of City of Canton v. Canton Cotton Warehouse Co.,84 Miss. 268, 36 So. 266 (1904); 25 Am.Jur. Highways § 163, at 456-458 (1940); 39 Am.Jur.2d Highways, Streets, and Bridges § 200, at 579 (1968); 40 C.J.S. Highways § 233a, at 244-247 (1944).See Sumner County v. Interurban Transportation Company, et al.,141 Tenn. 493, 213 S.W. 412, 5 A.L.R. 765 (1919).
The legislature of Mississippi has provided a method by which uniform designs and standard specifications for the construction of the State Aid Road System may be accomplished. The County Board of Supervisors are bound by these standards. Section 8035-03, Mississippi Code 1942 Annotated (1956).
Section 507.07 of the Mississippi Standard Specifications for State Aid Road and Bridge Construction (1951) provides, among other things, that "Unless specifically mentioned in the special provisions, the road will be closed to through traffic . . ." and "No road shall be closed by the Contractor to the public except by written permission of the Engineer."
The pertinent paragraphs of the foregoing Section 507.07 are as follows:
 "(1) When the Road is Closed to Through Traffic.
When a section of road under construction is closed to through traffic and detours around the new work are provided and maintained by the Board or other agencies, this procedure will not relieve the Contractor from the following responsibilities:
 (a) Provisions for safe means of ingress and egress, where practicable, to public or private properties which may be isolated from a public thoroughfare by the closure of the road." Mississippi Standard Specification § 507.07 (1951).
Professor Dean Williams, a teacher and civil engineer, testified that "local *Page 634 
traffic" means "traffic that originates on the road," and said ". . . but a person traveling from one end or the other or completely across the road should go around." Many of the witnesses testified about certain traffic going all the way through as "through traffic". We are of the opinion that although the contract between the County Board of Supervisors and the Farrish Gravel Company provided that the road would be closed to "through traffic", these words are not synonymous with "commercial traffic" and did not apply to the appellees' business of hauling gravel on the road.
 II.
It is also apparent from the testimony in this case that the Farrish Gravel Company is not entitled to damages for the repair of the road because it acquiesced in the use of the road by the Hudsons until just before the injunction was obtained.
The testimony shows that all of the Hudsons denied that the officers and agents of the Farrish Gravel Company ever demanded that they "get off the highway". Mr. J.N. Farrish said that: "I asked the defendants to stay off the road numerous times and offered them free gravel so they could maintain their operation"; but he also said they agreed to quit after a few loads.
Mr. Paul Hall, the general superintendent, testified that:
 "The defendants were asked on several occasions to slow down or to lighten the load, and they cooperated with me in doing this. Sometimes they did carry heavy loads across the road. They cooperated with me up until a few days before the injunction. I never personally asked them to stop hauling across this road prior to a few days before the injunction."
The county engineer, Mr. Monroe Short, testified that:
 "The contractor asked me to assist him with the Board of Supervisors to obtain weights on the road. I went only to individual members. There never was an official load limit. We are of the opinion that this is the responsibility of the contractor."
The Board of Supervisors has the authority and, of course, it is the duty of the Board to restrict load limits on roads where such loads are likely to injure or destroy the roads.
Section 8307, Mississippi Code 1942 Annotated (1956) is in the following language:
 "The boards of supervisors of any county may declare what is or may be an unusual or uncommon load or weight to be conveyed on or over the roads, bridges or approaches of any bridges in the county and shall have power to protect their roads and bridges from any unusual or uncommon use where the same is likely to injure or impair their usefulness as public highways, and recover damages for injuries." § 8307, Miss.Code 1942 Ann. (1956)
During all the time the Farrish Gravel Company now contends that the Hudsons were destroying the road and "tearing up the patches", the Farrish Gravel Company made no effort to have the Board of Supervisors perform any of the duties it might have performed to limit loads on the road or to close the road to public use; nor is it contended that the Board of Supervisors refused to act. Moreover, the general superintendent of Farrish Gravel Company admits that the Hudsons cooperated with him when he asked them so to do.
The general rule is expressed by one text writer as follows:
 "Under the rule requiring one injured by the negligent or wrongful act or omission of another to use reasonable efforts to lessen the resulting damage, it is the duty of one whose property is injured or threatened with injury to take reasonable precautions and to make reasonable expenditures to guard against or minimize such injury; and if he fails to do so, he cannot recover damages for any injuries which by the exercise of reasonable care he could have avoided. In *Page 635 
other words, the law will not allow one to sit idly by and see his property destroyed through forces negligently set in motion by another and then collect damages occasioned by his own failure to make reasonable exertion to arrest such disaster." 15 Am.Jur. Damages § 40, at 439 (1938).
See also 22 Am.Jur.2d Damages § 43, at 69 (1965).
 III.
The testimony in this case shows that the Farrish Gravel Company began priming the road on October 13, 1967; that is to say, spraying a liquid petroleum cover on the gravel base. The purpose of priming the base was to hold it in place until a slag cover and the asphalt could be added to the base. The priming was finished October 19, 1967, covering the entire project of 5.4 miles in length. The contractor began blacktopping the road on the west end and worked eastward. In October, the contractor lacked about two miles reaching the east end of the road with the blacktop. The project was stopped on October 25, 1967, because the temperature was too low to allow the "shooting of liquid asphalt" on the balance of the road. No work was done to the road, except to patch holes in the road for 104 days and until June 3, 1968. The contractor could have worked on the road at any time after March 14, 1968, but he was not required to do so.
The appellants, Hudsons, did very little hauling over the road in the fall of 1967. They began to haul over the east end of the project in the summer of 1968. The great weight of the testimony shows beyond question that the project road was never actually closed to any traffic. Log trucks, gasoline trucks, gravel trucks hauling for another county, "Co-op" trucks, farm tractors and equipment and pickup trucks passed over the road, not only locally, but over the entire length of the road. No signs were placed at either end of the road to notify the traveling public that traffic on the road was prohibited or limited. The record also shows that inclement weather will break the surface of a road covered only with a prime coat. It further shows that the 1967-68 winter was very severe; that there were many heavy snows and much hard freezing weather.
The contractor bases its claim for damage against the Hudsons upon the proposition that it cost the contractor more to repair the east end of the road than it cost to repair the west end, and since the Hudsons hauled gravel over the east end they must have caused the additional cost of repair. This thesis, however, is not tenable, since the west end of the road had been "shot" with slag and blacktopping before October, 1967, whereas the east end had been "primed" only. Moreover, the county engineer testified that from a surface standpoint, there was not a great deal of difference between the damages done to the western end of the road, although the damage on the east end was probably a little greater and deeper.
At this point we must recall that the Farrish Gravel Company had contracted to maintain the road for local traffic and did patchwork on the road from October, 1967 to June, 1968. A record was kept by the superintendent for Farrish Gravel Company of the cost of repair east and west of the gravel pit.
It is contended on appeal that one of the Hudsons admitted that they did some damage to the road, although he later denied this alleged admission, nevertheless, it is said that the Hudsons should pay damages since they did some damage, although others may have also damaged the road.
It is apparent, however, that even if the Hudsons did not have a right to use the road [which we do not hold] they could not be required to pay for patchwork caused by others, and caused by inclement weather since the Farrish Gravel Company agreed to maintain the road for local traffic (or some traffic).
As a general rule, damages which are uncertain, contingent or speculative are not recoverable. See many cases collected in 15 Am.Jur. Damages § 20, at 410 *Page 636 
(1938). Ordinarily, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether or not the damages resulted from the act of which complaint is made, or some other cause, or where it is impossible to say what of any portion of the damages resulted from the fault of the defendant and what portion from the fault of the plaintiff himself. 15 Am.Jur. Damages § 22, at 413 (1938). See also
Chevron Oil Company v. Snellgrove, 253 Miss. 356, 175 So.2d 471
(1965).
The damages sought in this case are not only speculative as to the amount of damages sought, but also because of the failure of the contractor to show any actionable wrong done to the contractor by the Hudsons in the use of the road.
The judgment of the trial court as to the issuance of an injunction under the emergency shown is affirmed. The monetary judgment against the appellants, Hudsons, is reversed and rendered. The cost of appeal is divided.
Affirmed in part; and reversed and rendered in part.
INZER, ROBERTSON, WALKER and BROOM, JJ., concur.