ROBERTSON, Justice:
The First National Bank of Jackson, Mississippi, has appealed from a judgment for $15,000 damages rendered against it and in favor of Ray S. Olive in the Circuit Court of the First Judicial District of Hinds County. The jury verdict, upon which the judgment was based, was against “the Defendants, First National Bank of Jackson, Mississippi, National Recovery Bureau, Inc., and Jimmy B. Downs,” but only the First National Bank has appealed from this judgment.
The bank assigns as error:
“I. The lower Court erred in allowing the plaintiff to recover punitive damages.
“II. The lower Court erred in allowing the jury to consider the highly speculative and conjectural issue of loss of sales commissions.”
On September 18, 1971, David Gollott of North Biloxi bought a used 1971 Cadillac Deville 4-door hardtop from Thad Ryan Cadillac, Inc., Jackson, Mississippi. Gol-lott executed to Ryan Cadillac a “Retail Installment Contract — Security Agreement and Disclosure Statement” showing a total of $5,780.16 to be paid in 36 equal monthly installments of $160.56 each to Ryan Cadillac in Jackson.
By a standard printed assignment form on the bottom of the retail installment contract, Ryan Cadillac assigned “all title and interest in and to the property therein described and all moneys due and to become due and all rights and remedies under said contract”, to the First National Bank, Jackson, Mississippi.
The retail installment contract contained this provision among others:
“Upon default Buyer agrees upon demand to deliver the vehicle to the Seller, or the Seller may with or without legal process, and with or without previous notice or demand for performance, enter any premises wherein the vehicle may be and take possession of the same, together with anything therein. Thereafter the Seller may, if permitted by law, retain the vehicle as its property or may sell same pursuant to the laws of Mississippi, whereupon the Buyer agrees to pay any deficiency upon demand. While removing the vehicle from point of repossession to Seller’s place of storage Seller may use Buyer’s license plates.” (Emphasis added).
Under the provisions of Mississippi Code Annotated section 63-21-21 (1972), which provides:
“The certificate of title shall be mailed to the first lienholder named in it or, if none, to the owner. If the original certificate of title is delivered to a lien-holder, a nontransferable duplicate certificate of title shall be mailed to the owner to serve as a permit for operation of the motor vehicle,”
the bank held the original certificate of title in its custody.
In June, 1973, Gollott defaulted in his monthly payment to the bank, and the bank, *570 after unsuccessfully trying to contact and collect from Gollott, finally turned the account' over to National Recovery Bureau, Inc., Jimmy B. Downs, President, for handling.
Unbeknown to the Bank, in early June, 1973, Gollott traded his 1971 Cadillac to Buffington Ford Company of Collins, Mississippi. On June 14, 1973, Buffington Ford sold the Gollott Cadillac to Ray S. Olive of Monticello, Mississippi, and executed a bill of sale to Olive on that date, showing a consideration of $4,595.
As required by “The Mississippi Motor Vehicle Title Law” [Section 63 — 21—9(b) ], Buffington Ford furnished Olive with a signed copy of “Application for Certificate of Title”. Section 63-21-9(b). required of a used car dealer:
“After July 1, 1969, any dealer, acting for himself, or another, who sells, trades or otherwise transfers any used vehicle as defined in this chapter, shall furnish to the purchaser or transferee, without charge for either application or certificate of title, an application for title of said vehicle and cause to be forwarded to the motor vehicle comptroller any and all documents required by the motor vehicle comptroller to issue certificate of title to the purchaser or transferee. The purchaser or transferee may then use the duplicate application for title as a permit to operate vehicle as provided in Section 63-21-67, until certificate of title is received. (Emphasis added).
“Any dealer, acting for himself or another who sells, trades or otherwise transfers any vehicle required to be titled under this chapter who does not comply with the provisions of this chapter shall be guilty of a misdemeanor and upon conviction shall be fined in a sum not exceeding five hundred dollars ($500.-00).”
Section 63-21-15(7) also required of a used car dealer:
“Every designated agent within this state shall, no later than the next business day after they are received by him, forward to the comptroller by mail, postage prepaid, the originals of all applications received by him, together with such evidence of title as may have been delivered to him by the applicants." (Emphasis added).
Buffington Ford, for reasons known only to itself, did not comply with Section 63-21-15(7), and did not forward the original application for certificate of title to the Motor Vehicle Comptroller until October 24, 1973.
On June 15, 1973, Olive bought a Mississippi license tag for his Cadillac from the tax collector of Lawrence County at Monticello, Mississippi, and was issued a tax receipt for this tag showing under “Seller name and address” “Buffington Fd. Collins”.
The Bank’s agent, Phil Dickerson, found out about September 7, 1973, that Olive had purchased a tag for the Gollott Cadillac and this information was passed on to Jimmy Downs of the National Recovery Bureau.
Downs tried to contact Ray Olive in Monticello, on two different occasions and, failing to do so, finally called a Mrs. Olive in Natchez, and she told him that Ray Olive was en route to Lewisville, Arkansas. Downs contacted Don Thornton with the Alert Recovery Division in Arkansas on October 5, 1973, and an agent of Alert found the car Saturday morning, October 6th, on the hospital parking lot in Lewis-ville, Arkansas. The car was unlocked and the ignition key was in it, so the Arkansas agent repossessed the car and drove it away. The repossession was promptly reported by Alert Recovery to the local sheriff’s office.
A few moments after it was repossessed, Olive discovered his car gone, and called the sheriff’s office in Lewisville. Olive *571 was advised of the repossession and he immediately called Buffington Ford.
Buffington Ford contacted the First National Bank in Jackson on Monday, October 8, paid the Bank off, flew a salesman to Little Rock, Arkansas, who drove the car back to Jackson and re-delivered the car to Ray Olive on October 14, 1973, at the Hinds County Courthouse in Jackson.
It is undisputed that the Bank, under the terms of the retail installment contract, would have had the right to take peaceable possession of the automobile without previous notice and without legal process from the original buyer, Gollott.
It is also undisputed that Olive was a bona fide purchaser for value without notice from Buffington Ford.' We agree with these comments of the trial court:
“I agree completely that the principal wrongdoer, if there are any wrongdoers at all in the matter, and the principal person or the principal entity responsible for this is Buffington Motor Company. But the Plaintiff chose to try this case and endeavor to make out a case against these defendants.”
As far as the Bank is concerned, the question boils down to this: When the Bank found out in September that Ray Olive of Monticello, Mississippi, had purchased a Mississippi license tag for the Gollott Cadillac, what investigation should the bank have made to determine the true facts ?
Both in its briefs and in oral argument, the Bank has admitted liability for actual damages, but it vigorously denies that it is liable for punitive damages.
The Bank contends that neither Gollott nor Buffington Ford, as required by the Motor Vehicle Title Law, ever notified it of their trade or of the sale to Olive, and that the Bank was making a bona fide effort to collect its debt, with no malice or ill will toward anybody. The Bank says if it were negligent it was guilty of simple negligence only. With this contention we agree.
This is not a case of gross, wanton and reckless negligence that would justify the allowance of punitive damages. The trial court was in error in granting an instruction authorizing the recovery of punitive damages. See Lamar T. Loe Motor Co. v. Harrell, 298 So.2d 273 (Miss.1974); Dorsey Mississippi Sales, Inc. v. Newell, 251 Miss. 77, 168 So.2d 645 (1964); Wood v. Mississippi Power Co., 245 Miss. 103, 146 So.2d 546 (1962).
The Bank complains that the lower court erred “in allowing the issue of Plaintiff’s alleged loss of earnings and commissions to be considered by the jury”.
Olive’s testimony on lost sales commissions was:
“Well, I had given a quote to an outfit over at Hodges, Louisiana on three machines at approximately $75,000. I work for a salary and a commission and an expense account. And the commission on these three machines would have been $3,750.00 had I gotten the deal. But I didn’t have a copy of the quote, I didn’t have anything to go back to them on; and when I finally got all of this stuff back that was in the car and went back over there, they’d bought other machines.”
“Q Well, did you already have the contract, or were you just negotiating?
“A No, it was in the state of negotiation in that they had asked me for a bid and I had given them a bid and had a copy of that bid in my car, and I didn’t remember the exact amount of it.
“Q Could you have made another bid and sent it to them?
“A Pardon ?
“Q Could you have made another bid and sent it to them?
*572 “A. Well, possibly. It takes a good deal of time to make up a bid.
“Q Did you call the people and tell them what your problem was and that you’d get another bid in shortly?
“A I called them, and they said they’d already bought another machine, other machinery.”
“Q And how much decrease in your income resulted from your not being able to call on them [dealers] if you know?
“A Oh, I’d say two or three thousand dollars in addition to that $3750.00.”
This testimony is highly conjectural and speculative and would not justify nor support a verdict for lost sales commissions. In Hudson v. Farrish Gravel Co., Inc., 279 So.2d 630 (Miss.1973), we said:
“As a general rule, damages which are uncertain, contingent or speculative are not recoverable. See many cases collected in 15 Am.Jur. Damages § 20, at 410 (1938). Ordinarily, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether or not the damages resulted from the act of which complaint is made, or some other cause, or where it is impossible to say what of any portion of the damages resulted from the fault of the defendant and what portion from the fault of the plaintiff himself. 15 Am.Jur. Damages § 22, at 413 (1938). See also Chevron Oil Company v. Snellgrove, 253 Miss. 356, 175 So.2d 471 (1965)”. 279 So.2d at 635-36.
Olive claimed in his declaration that he was entitled to $170 damages ($17 a day for 10 days) as the “reasonable rental for a similar vehicle”. His proof was that he actually rented a car from his son-in-law for the 10-day period (that he was without his Cadillac) at $15 a day.
In National Dairy Products Company v. Jumper, 241 Miss. 339, 130 So.2d 922 (1961), this Court said:
“When a commercial vehicle which has been injured may be repaired, if the repairs will substantially restore it to its former condition, the cost of such repairs will ordinarily furnish an element of damages. Anno., 4 A.L.R. 1350, 1352— 1355 (1919); 5A Am.Jur., Automobiles and Highway Traffic, Sec. 1114. If in addition to the physical injury the owner has lost the vehicle’s use for a period of time, as during the process of repair, he is entitled to the value of the use of the property during this period. 4 A.L.R. 1355. The weight of authority is that, except in special circumstances, loss of profits cannot he considered as a measure of such damages. Such an element usually contains considerable speculation and conjecture. 4 A.L.R. 1361; 5A Am.Jur., ibid., Sec. 1116; 25 C.J.S. Damages § 83, p. 602; Anno., 169 A.L.R. 1074 (1947). A more precise and easily defined measure for loss of use of a commercial vehicle is the rental or usable value of the property during the period the owner has been deprived of it. This is the generally recognized criterion. Damages for loss of use should be measured by the cost of hiring another vehicle while the repairs are being made. The rental value of a replacement vehicle may be recovered, even though no other was actually procured during the interval. 5A Am.Jur., ibid., Sec. 1115.
“Where no substitute vehicle can be rented in the market and area reasonably related to complainant’s business and trade area, loss of profits may be recovered where the evidence is of sufficient probative value to adequately and clearly measure such loss of profits. However, an award for loss of profits is erroneous in the absence of a showing that no other vehicle could be rented or that the rental value could not be determined. 25 C.J.S. Damages § 83, pp. 601-602. The cited annotations and texts discuss a multitude of cases following these principles.” 241 Miss, at 343-44, 130 So.2d at 923. (Emphasis added).
*573 Unfortunately the verdict in the case at bar is a general verdict for $15,000. There is no way for this Court to know what part of the jury verdict is for punitive damages; nor is there any way for this Court to know if the jury took into consideration the highly conjectural and speculative testimony on sales commissions, in arriving at the amount of its verdict.
The judgment is reversed and this cause remanded for a new trial on actual damages alone.
REVERSED AND REMANDED.
PATTERSON and INZER, P. JJ, and SMITH, SUGG, WALKER and BROOM, JJ, concur.
GILLESPIE, C. J, took no part.