909 So.2d 1173 (2005)
Christopher W. ERICKSON, Appellant,
v.
Victor P. SMITH, David H. Beard, Windward Bluff Homeowners Association, Inc. and Lakeshore Pointe, LLC., Appellees.
No. 2003-CA-00774-COA.
Court of Appeals of Mississippi.
January 25, 2005.
*1175 K.F. Boackle, Madison, attorney for appellant.
Anselm J. McLaurin, Brandon, attorney for appellees.
Before BRIDGES, P.J., MYERS and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. The Chancery Court of Rankin County found David H. Beard, Victor P. Smith, and Lakeshore Pointe, LLC. jointly and severally liable to Appellant Christopher W. Erickson in the amount of $1.00. *1176 Erickson appeals arguing that the evidence was sufficient to support a $11,947 loss of value of Erickson's town home caused by the lack of certain amenities, that he was entitled to a refund of thirty-six months of homeowners assessments paid, and that he was entitled to attorney fees and costs associated with the litigation. Finding no error in the chancellor's determinations that Erickson failed to prove that the loss in value of the town home was caused by the lack of amenities or his entitlement to any other relief, we affirm.

STATEMENT OF FACTS AND DISPOSITION BELOW
¶ 2. Christopher Erickson purchased a town home located in Phase I of the Windward Bluff development on April 1, 1999 from developers David H. Beard and Victor P. Smith.[1] He paid $162,847. Erickson claimed that prior to his purchase, representations were made to him that Phase II of the development, located on the Ross Barnett Reservoir, would have a pier, boardwalk, tower, and a clubhouse with a pool. These representations were contained in a brochure for Windward Bluff which Erickson claimed was provided to him in mid-1998 by the marketing agent for the development.[2]
¶ 3. The developers' original concept for Windward Bluff was to build a new product for Jackson, attached town homes with a dramatic look; they anticipated that it would take three to four years to complete both phases of the development. Although their marketing data had not indicated a potential problem, once into the project the developers found that the attached town house concept was not well accepted in the market; having a common wall with adjoining units made the development more like rental than owner/occupied properties. The acceptance of the town house concept was not the only thing the developers had misjudged; a number of the amenities planned for Phase II of the development (and depicted in the original brochure) had to be abandoned.
¶ 4. David Beard testified that it became apparent in 1997 or 1998 that the pier could not be constructed. Ricky Calloway, a representative of the reservoir board, informed the developers that the Corps of Engineers would not approve the pier because it would interfere with the operation of the emergency spillway. Also, the developers' insurance company informed them that policing a pier would be virtually impossible; at night unauthorized persons could pull up and use the pier to gain entry to what was supposed to be a secure development. Further, their engineers informed the developers that the waterfront boardwalk could not be constructed because in order to anchor the boardwalk, they would have to disturb the rip-rap and make the shoreline unstable. Beard testified that even without the boardwalk, the developers had spent approximately $60,000 in additional rip-rap, trying to stabilize the shore. As to the proposed tower, the reservoir board and the developer's insurance company objected because it would be an attractive nuisance; Beard stated that the tower was "just a bad idea" because "young men, either sober or intoxicated, *1177 would like to see if they could climb to the top."[3]
¶ 5. Erickson moved from the Jackson area in November of 2000 to work in Utah. He rented his town home until he was able to sell it. Erickson's original listing price was $177,900; the unit was on the market for nearly two years and was eventually sold to James Jeff in May 2002, for $150,900, or $11,947 less than Erickson's original purchase price. At the time Erickson sold his unit, the boardwalk, pier and tower had not been constructed, and the pool and clubhouse, though substantially complete, were not yet open.
¶ 6. Erickson filed suit, first and foremost, seeking damages from the loss in value of his town home. He attributed the loss in value to the lack of amenities allegedly promised before his purchase. After a two-day trial on the merits, the Chancery Court of Rankin County, Mississippi, found that while Beard, Smith and Lakeshore Pointe LLC. were not liable for fraud or breach of contract, they were negligent in not determining that they could obtain the necessary authority or permits to construct the amenities before printing brochures which included them. The court assessed only nominal damages, however, because Erickson "failed to prove affirmatively that the lack of amenities caused the decline in his property value." To the contrary, the court found that "more likely is that the market did not embrace the [town house] concept, and with regard to Erickson's unit itself, its poor attractiveness to buyers due to its condition." The count determined that Erickson "could only show a decline in property values but could not quantify the degree to which the amenity issue contributed."
¶ 7. Second, Erickson asked the court to order a refund of the $65 per month assessment he paid to the Windward Bluff Homeowners Association during his thirty-six-month ownership based on his interpretation of the following clauses from article IV, sections 3 and 4, respectively, of the Declaration of Covenants, Conditions and Restrictions for Lakeshore Pointe LLC d/b/a Windward Bluff Townhouses [hereinafter, the "Declaration of Covenants"]:
Until the date of the first meeting of the Association, the Declarant, on behalf of the Association, shall have the responsibility and duty of improving and maintaining the Common Areas, including, but not limited to, paying the cost of labor, equipment (including the expense of leasing any equipment) and materials required for, and management and supervision of the Common Areas and payment of rent on the Common Areas to the [Pearl River Valley Water Supply District]....
It shall be the duty of the Board to prepare a budget covering the estimated costs of operating the Association during the coming year, which shall include a capital contribution or reserve in accordance with a capital budget separately prepared.... The budget and the assessment shall become effective unless disapproved at a meeting by a majority of all Owners. Notwithstanding the foregoing, however, in the event the membership disapproves the proposed budget or the Board fails for any reason so to determine the budget for the succeeding *1178 year, then and until such time as a budget shall have been determined, as provided therein, the budget in effect for the then current year shall continue for the succeeding year.
Erickson contends that since the homeowners' association never had its first meeting, prepared budgets or rendered accountings, he is entitled to a refund of all of the fees he paid to the association.
¶ 8. Erickson fails to acknowledge the provision which immediately follows the portion of section 3 upon which he relies:
In this regard, and until such time, all assessments, both annual and special, collected by the Association (less such amounts required for the operation of the Association) shall be forthwith paid by the Association to Declarant, to the extent that such assessments are required by Declarant to improve and maintain the Common Areas as set forth in this paragraph. (Emphasis added)
Erickson does not contend that he did not receive any value for the amount he paid in homeowners' assessments and admits that he saw people cutting grass and doing landscaping work at the development. Diane Ritter, who maintained the records of the homeowners' association, testified that on one occasion, when she had assisted Erickson in obtaining reimbursement for a portion of sewer work in his unit, he sent her a letter of thanks and included his check for association dues which had not yet even been billed.
¶ 9. The chancery court found that the testimony concerning adherence to procedures regarding the budget was a collateral issue with no bearing on the outcome of the case; the court determined that that preparation of a formal budget was "pointless" since expenditures exceeded revenues and Lakeshore Pointe made up the difference. The chancellor concluded that no evidence was offered to prove that any act or dereliction by the Windward Bluff Homeowner's Association caused or contributed to any loss or damage on Erickson's behalf and dismissed the case against the association.
¶ 10. Further, Erickson sought attorney's fees and costs pursuant to section 14(c) of his contract for purchase.[4] The chancery court ruled that even if Erickson had proved entitlement to damages on his underlying claim, he would still not be entitled to attorney's fees or expenses as attorney's fees are not recoverable in this state in the absence of statutory authority or contractual provision between the parties allowing their recovery. While the original contract between Erickson, Beard and Smith contained a provision for attorney's fees to the prevailing party in the event of a breach, no breach of a provision contained in the contract was alleged or proven; the court determined that "[a]ny contractual provision for amenities could at best be an ex-contractu verbal promise for which no provision for attorney's fees existed." Further, the court noted that although Erickson raised the issue in his pleadings, he did not request attorney's fees or litigation expenses in his testimony or offer any proof as to the amounts of such.
¶ 11. Lastly, on motion by Erickson, the chancery court ordered mediation between the parties. This mediation attempt was unsuccessful. Based on the bill of appellant's attorney and the mediator's bill, the mediation lasted approximately *1179 three hours. While the appellees attended the entire mediation, they declined to make a counteroffer to Erickson's initial offer. Erickson filed a motion for costs, claiming that the appellees did not participate in the mediation in good faith and requesting sanctions in the amount of $1,760.41 representing the expenses incurred by Erickson in traveling from Utah for the mediation, his share of the mediation fee and his attorney's fees attributable to the mediation and the motion for costs. The chancery court heard this motion prior to the hearing on the merits but held ruling in abeyance: "This Court is of the opinion that there isn't any way I can tell whether or not in good faith was made on [sic] not based on what's been submitted. I'm going to hold the ruling of this matter in abeyance until such time as I've heard the case on the merits, and then I will make a determination at that time whether or not sanctions are appropriate or not." Neither the court's Findings of Fact and Conclusions of Law nor the Judgment entered in accordance therewith made any reference to the motion for costs arising from the unsuccessful mediation.

STANDARD OF REVIEW
¶ 12. Our scope of review is limited in appeals from Chancery Court. We will not disturb a chancellor's findings of fact unless they are "manifestly wrong or clearly erroneous." If the chancellor's findings are supported by substantial credible evidence in the record, those findings must be affirmed. In re Estate of Thomas, 883 So.2d 1173, 1176(¶ 9) (Miss.2004); Hammett v. Woods, 602 So.2d 825, 827 (Miss.1992). "The standard of review for questions of law is de novo." Starcher v. Byrne, 687 So.2d 737, 739 (Miss.1997). Questions concerning the construction of contracts are questions of law. G.B. "Boots" Smith Corp. v. Cobb, 860 So.2d 774, 777(¶ 6) (Miss.2003).

ISSUES AND ANALYSIS

I. WHETHER THE EVIDENCE WAS SUFFICIENT TO PROVE THAT THE LOSS OF VALUE SUFFERED BY ERICKSON WAS THE PROXIMATE RESULT OF THE DEVELOPERS' FAILURE TO PROVIDE CERTAIN PROPOSED AMENITIES
¶ 13. The Mississippi Supreme Court has stated on numerous occasions:
Ordinarily, no recovery can be had where resort must be had to speculation or conjecture for the purpose of determining whether or not the damages resulted from the act of which complaint is made, or some other cause, or where it is impossible to say what of any portion of the damages resulted from the fault of the defendant and what portion from the fault of the plaintiff himself.
See Hudson v. Farrish Gravel Co., 279 So.2d 630, 636 (Miss.1973); see also Ciba-Geigy Corp. v. Murphree, 653 So.2d 857, 869 (Miss.1994) (quoting Hudson). Great deference is given to the Chancellor's findings of fact. We will not reverse a Chancellor's findings where they are supported by "substantial credible evidence in the record." Hammett, 602 So.2d at 827. In this case, the Chancellor found that while the developers were negligent in advertising and representing amenities would be built in the Windward Bluff development without confirming that the amenities could be so constructed, Erickson did not prove the lack of amenities was the proximate cause of his loss. In fact, the court found that "[s]everal other reasonable causes were established by the evidence" and that it was "more likely" that "the market did not embrace the [town house] concept, and with regard to Erickson's unit itself, its poor attractiveness to buyers due to its condition." These findings are supported *1180 by substantial evidence and will not be disturbed on appeal.
¶ 14. David Beard, one of the developers, testified that the original concept for Windward Bluff, attached town homes, was new for the Jackson area and was not well accepted in the market because having a common wall with neighbors made the property more like rental than owner/occupied property. Instead of the town homes, in Phase II, the developers changed to the garden home concept which was accepted in the marketplace and easy to market and sell.
¶ 15. Erickson placed his home on the market in April 2000 with an original list price of $177,900; it was only shown one time in the first year. Jane Swain, the real estate agent with 24 years of experience who assisted Erickson in the sale of his town home, testified, "there was a lot of things that had a negative effect on marketing this house or this condo." She listed the location (for a "high-end development like this, it was a very poor choice of location; across from a water slide, a strip shopping center, apartments on one side, a major intersection"), not having the amenities, rumors that the development was "all in trouble," difficulty in "compet[ing] against the development" in trying to resale a unit while the development is placing new units on the market and the fact that Erickson's property had become "dirty" and "did not show well" the very latter part of 2001. She admitted that there were dirty dishes in the sink, beds not made, and a strong cat odor and testified that these matters have an effect on people when they would come in and look at the property as to its desirability.
¶ 16. Sylvia Nutt, a real estate broker since 1987, showed Erickson's property in 2002. When she took a client in to view the property, "it had an odor like an animal odor, and it was not very clean. Of course, when you've got an odor, you automatically think it is not clean. The kitchen was not very neat and she would not go any further." The client ended up buying another property in the Windward Bluff development.
¶ 17. James Jeff testified that the property that he eventually purchased from Erickson did not show well compared to other properties and commented to his real estate agent about it. For example, there were dirty clothes on the floor and on the beds and dishes in the sink. There were places where the carpet did not meet the tile in the foyer and kitchen. He hoped that the poor showability would affect other people viewing the property and that he would be able to "get by with a lower offer." When asked whether he would have offered more had there been a boardwalk and pier, Jeff testified that his offer "was probably based more on their asking price at the time and the general condition and the way it showed and how long it had been on the market." He further testified that the fact that Erickson sold the property "as is" "worried him" and probably stopped him from increasing his offer.
¶ 18. Harry Little was tendered by Erickson as an expert in the field of real estate appraisal and valuation and accepted by the court as such. Based upon the amount of time units in the Windward Bluff development were on the market, Little concluded "that there's a problem in the subject development that is not associated with the rest of the neighborhood." He testified, "we've heard a lot today about the amenities and I think that has a lot to do with it. People expect the amenities to be there and the market, I think, anticipates this." Little continued that "something had to trigger the decline in value out there" but did not think that the matters listed by Jane Swain regarding *1181 the water slide, major intersection, apartments, and strip shopping center caused the decline. He testified that the number of rental units (thirteen of the thirty-nine units) could negatively affect the value of units and the resale possibilities because of the inability of purchasers to obtain certain forms of financing (including "Fannie Mae") when the percentage of owner/occupied units dropped below seventy percent.
¶ 19. On cross-examination, Little agreed that Erickson's asking price of $177,900 was unquestionably too high and admitted that the fact that the property was on the market for approximately two years indicated that "perhaps they were asking too much money in the beginning." He acknowledged that the declaration of covenants for development specifically allows units to be leased for residential purposes. When asked, whether in Erickson's leasing his own unit prior to sale, "Mr. Erickson essentially helped cut his own throat, then?" Little replied "I wouldn't say that, but you could."
¶ 20. Most notably, Little admitted that he had no "objective data" that Erickson received a lower price because there was no pier or boardwalk in the development. Little testified "[w]hat I do know from objective data is that there appears to be a problem within the Windward Bluff development that units have not sold, marketing times are excessive compared to other properties in the area, and that the trend based upon available sales ... in that development is going down when other developments are going up. I think that is objective. Now, as far as being able to nail down specifically which of the factors affected it, I don't have objective data to support that." (Emphasis added.) Little confirmed that just as he could not quantify the effect of lack of Fannie Mae financing, he could not quantify the effect of lack of a pier, boardwalk or tower.
¶ 21. The Chancellor's determination that Erickson failed to prove that his loss was attributable to the lack of amenities is based on substantial evidence and is affirmed.

II. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN DENYING ERICKSON A REFUND OF ASSESSMENTS PAID TO THE WINDWARD BLUFF HOMEOWNERS ASSOCIATION.
¶ 22. Erickson cites no legal authority in support of this issue. It is the appellant's duty to provide legal authority in support of his claims of error. Drennan v. State, 695 So.2d 581, 585-86 (Miss.1997). Erickson's failure to cite authority for this issue precludes our appellate review. Lauro v. Lauro, 847 So.2d 843, 851(¶ 21) (Miss.2003). Nevertheless, Erickson's contention that he is entitled to a refund of the homeowners assessments paid during his ownership is without merit. Article IV, Section 10 of the Declaration of Covenants provides that the annual assessments will commence upon the conveyance of the first unit. Erickson constantly refers to the first sentence of section 3 (until the first meeting of the association, the declarant is responsible for maintaining the common areas, including payment of all costs) while ignoring the second sentence (until such time, all assessments collected by the association shall be paid to the declarant). When read in its entirety, section 3, clearly provides that association fees are due and payable prior to the first meeting of the association and that the assessments collected by the association will be paid to the declarant, so that the declarant can effectively maintain the common areas in the development. A proper construction of section 3 fully supports the chancellor's denial of Erickson's claim for a refund of assessments paid by him.
*1182 ¶ 23. Further, Erickson's claim is undermined by his own concession on cross-examination that he did not contest that he received value for the money he paid in homeowner's assessments. He admitted to having observed workers cutting grass and doing landscaping at the development. Erickson paid his assessments without protest, once even before the assessment was billed. He has not attempted to identify any portion of the assessments which were misspent by the association or the declarant. The chancellor's conclusion that no evidence was offered to prove that any act or dereliction of the homeowners association (including failure to prepare a formal budget) caused or contributed to any loss or damage on Erickson's behalf is supported by the record and affirmed.

III. WHETHER CHANCELLOR ABUSED HIS DISCRETION IN DENYING ERICKSON ATTORNEY'S FEES.
¶ 24. "The propriety and quantum of attorney's fees are committed to the sound discretion of the awarding judge and must be supported by credible evidence." Theobald v. Nosser, 784 So.2d 142, 146(¶ 13) (Miss.2001). Erickson makes a claim for attorney fees and costs based on paragraph 14(c) of his contract for purchase, quoted above. Erickson claims his entitlement to fees based upon his contentions that the sellers breached the contract because certain proposed amenities were included in the purchase price but never built and breached an implied duty of good faith and fair dealing with respect to their failure to construct the amenities.
¶ 25. The chancery court determined that Erickson was not entitled to an award of attorney's fees or expenses as he had failed not only to prove his underlying claims but also to present proof of attorney's fees or litigation expenses. The court continued that even if Erickson had proved his entitlement to damages on his underlying claim, he would still not be entitled to attorney's fees under the contractual provision as no breach of a provision contained in the contract was alleged or proven; any contractual provision for the amenities would "at best be an ex-contractu verbal promise for which no provision for attorney's fees existed."
¶ 26. The chancellor did not abuse his discretion in this regard. First, an award of attorney's fees must be supported by credible evidence; "[w]hen a party fails to present competent evidence to determine attorney's fees, the award may be denied." Romney v. Barbetta, 881 So.2d 958, 962(¶ 20) (Miss.Ct.App.2004). Erickson presented no proof of attorney's fees or litigation expenses at trial. Although he now submits that "[m]ost trial courts will rule on the issue of attorney fees and allow the submission of an attorney fee affidavit as to the total fees paid," he cites no authority requiring the court to take evidence in this manner. Erickson's failure to offer proof at trial was done at his own peril.
¶ 27. Second, the chancellor did not err in determining that the contractual attorney fee provision does not cover this dispute over amenities. "`In contract construction cases a court's focus is upon the objective fact-the language of the contract. [A reviewing court] is concerned with what the contracting parties have said to each other, not some secret thought of one not communicated to the other.' Only if the contract is unclear or ambiguous can a court go beyond the text to determine the parties' true intent." G.B. "Boots" Smith Corp., 860 So.2d at 777(¶ 7) (quoting Turner v. Terry, 799 So.2d 25, 32(¶ 17) (Miss.2001)). In this case, the contract for purchase makes no reference either to the proposed amenities *1183 or the brochure depicting them. Paragraph 21 of the contract expressly provides that the written agreement contains the entire and final agreement of the parties, that neither party has relied upon any statement or representation not contained therein, and that neither party shall be bound by any term, condition, or representation not contained in the written agreement. The chancellor correctly determined that the provision providing for attorney's fees should "it become necessary to insure the performance of the conditions of this contract," did not apply to this dispute regarding amenities not mentioned in the contract.
¶ 28. Although the chancellor did not specifically address Erickson's contention that the developers also breached an implied covenant of good faith and fair dealing by not constructing the proposed amenities, the court's determination that the contractual attorney fee provision does not cover the amenity dispute correctly disposes of this contention. The Mississippi Supreme Court has stated that "[g]ood faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party." Cenac v. Murry, 609 So.2d 1257, 1272 (Miss.1992) (emphasis added). In this case, there was no "agreed purpose" between the parties respecting the amenities which were not mentioned in the contract. Further, it is difficult to see how Erickson could have had any "justified expectation" regarding the amenities when the contract provided that neither party would be bound by any terms, conditions or representations not contained in the contract.
¶ 29. In any event, although the chancery court determined that the developers were negligent in not determining that they could obtain the necessary authority or permits to construct the amenities before printing brochures which included them, negligence is insufficient to support a claim for breach of the duty of good faith. "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness. Bad faith, in turn, requires a showing of more than bad judgment or negligence; rather, `bad faith' implies some conscious wrongdoing `because of dishonest purpose or moral obliquity.'" Harris v. Mississippi Valley State University, 873 So.2d 970, 987(¶ 51) (Miss.2004) (quoting Cenac, 609 So.2d at 1272 and Bailey v. Bailey, 724 So.2d 335, 338(¶ 9) (Miss.1998), respectively). Erickson has cited no facts which would justify a finding of "bad faith" on the part of the developers, and a thorough review of the record has disclosed none.
¶ 30. The chancellor's denial of attorney's fees is, therefore, affirmed.

IV. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN DENYING ERICKSON'S MOTION FOR COSTS OF UNSUCCESSFUL MEDIATION.
¶ 31. On motion by Erickson, the chancery court ordered mediation between the parties. The mediation was unsuccessful. Although the appellees attended the entire mediation, which lasted approximately three hours, and reviewed Erickson's proposed offer of settlement, he contends that the appellees did not participate in good faith because they allowed him to incur travel expenses and then refused to make a counter offer. The chancery court heard argument on the motion prior to the hearing on the merits but held ruling in abeyance. Neither the court's findings of fact and conclusions of law nor the judgment entered in accordance therewith made any reference to the motion for costs arising from the unsuccessful mediation. A review of court's findings and *1184 conclusions evidences that the denial of attorney's fees and costs of litigation contained therein is not intended to dispose of the motion for costs.[5] "It is the responsibility of the movant to obtain a ruling from the court on motions filed by him and failure to do so constitutes a waiver of the same." Martin v. State, 354 So.2d 1114, 1119 (Miss.1978). Erickson's motion for costs is, therefore, procedurally barred.
¶ 32. Further, an order respecting sanctions for failure to participate in mediation is within the discretion of the court. MS R Mediation for Civil Litigation, VI. In the event the chancellor's rulings were intended to deny Erickson's motion for mediation costs, we find no abuse of discretion. The hearing on the motion consisted entirely of argument of counsel. The chancellor found "that there isn't any way I can tell whether or not in good faith was made on [sic] not based on what's been submitted." At trial on the merits, no evidence was introduced regarding the conduct of the mediation, and the chancery court awarded only $1.00 in damages. There is nothing in the record to suggest that had the appellees made a counter offer of $1.00 at mediation, Erickson would have been any less aggrieved or would have accepted the offer. Refusal to impose sanctions based on the appellees' refusal to make a counteroffer under these circumstances does not constitute an abuse of the chancery court's discretion.
¶ 33. THE JUDGMENT OF THE CHANCERY COURT OF RANKIN COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR.
NOTES
[1] Beard and Smith are the principal owners of Lakeshore Pointe, LLC.
[2] While the Chancellor found that Erickson's testimony in this regard was "seriously impeached," the court determined that Erickson's testimony that he purchased the property "to some degree" in reliance on the representation of the developers that the amenities would be constructed had not been refuted. This finding has not been challenged on appeal.
[3] Beard testified that the original brochure which depicted these amenities had not been used since early 1998; Dianne Ritter, bookkeeper for Lakeshore Pointe, testified that the she had destroyed all of the original brochures in her possession prior to that time; she admitted, however, that she had not collected or destroyed all the brochures in the hands of real estate agents.
[4] Section 14(c) of the February 4, 1999 contract for sale to Erickson provides: "If it becomes necessary to insure the performance of the conditions of this contract for either party to hire legal counsel, then the defaulting party agrees to pay reasonable attorney's fees and costs in connection therewith."
[5] The court's only citation of authority for attorney's fees is section 14(c) of Erickson's contract for purchase; had the court intended to rule on the motion for mediation costs, he would also have cited Rule VI of the Court Annexed Mediation Rules for Civil Litigation providing for sanctions, including attorney's fees, in appropriate situations. Further, the only litigation expense expressly mentioned by the court was expert witness fees; these fees were not attributable to the mediation process; again, had the court intended to rule on the motion for mediation costs, he would have mentioned the specific costs claimed by Erickson's motion (travel expenses and mediator's fees).