# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00175-COA

**RANDY SCOTT THOMAS**

**APPELLANT/
CROSS-APPELLEE**

**v.**

**BRANDIE JEAN BROWN THOMAS**

**APPELLEE/
CROSS-APPELLANT**

DATE OF JUDGMENT:                01/24/2017
TRIAL JUDGE:                     HON. JACQUELINE ESTES MASK
COURT FROM WHICH APPEALED:       PONTOTOC COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          RICHARD SHANE McLAUGHLIN
ATTORNEY FOR APPELLEE:           JAK McGEE SMITH
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     ON DIRECT APPEAL: AFFIRMED AS
                                 MODIFIED. ON CROSS-APPEAL:
                                 AFFIRMED IN PART, REVERSED AND
                                 REMANDED IN PART - 06/11/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON AND J. WILSON, P.JJ., AND TINDELL, J.**

**J. WILSON, P.J., FOR THE COURT:**

¶1. Randy and Brandie Thomas consented to an irreconcilable differences divorce and agreed that the chancery court would determine custody of their three minor children, set visitation, award child support, equitably divide the marital estate, and decide their claims for attorney's fees. The chancery court resolved all of the stipulated issues in a final judgment and subsequent order addressing the parties' post-trial motions. Randy appealed, and Brandie cross-appealed. Randy alleges that the chancellor committed six errors, while Brandie raises seven additional issues. For purposes of analysis and discussion, we have

combined a number of the parties' claims.

¶2. Randy argues that the chancellor erred by awarding Brandie physical custody of the children, while Brandie argues that the chancellor erred by awarding Randy too much visitation. We find no clear error or abuse of discretion in either ruling.

¶3. Randy argues that the chancellor overstated his income and ordered him to pay too much child support, while Brandie argues that the chancellor understated Randy's income and did not order him to pay enough support. Brandie also argues that the chancellor erred by granting Randy a credit against his child support arrearage for a lump sum payment that he received for past due Social Security benefits for their children on account of his disability. We find no clear error or abuse of discretion in the chancellor's findings regarding Randy's income or prospective child support obligation. However, we conclude that the chancellor erred in part in calculating Randy's credit against his child support arrearage. We remand for further proceedings on that issue only.

¶4. Randy challenges the fairness of the division of the marital estate. We find no error or abuse of discretion in the chancellor's analysis. We modify the judgment only to clarify ownership of a Yamaha "Rhino" Ranger ATV and a motorcycle.

¶5. Finally, on cross-appeal, Brandie argues that the chancellor erred by awarding Randy one-half of the income tax deductions for the children and by awarding her only $1,000 in attorney's fees. We find no error or abuse of discretion in either ruling.

¶6. Thus, we modify the judgment of the chancery court to clarify ownership of the ATV and motorcycle, and we reverse and remand for recalculation of Randy's child support

2

arrearage and disposition of the lump sum payment of past due Social Security benefits for the children. In all other respects, the judgment of the chancery court is affirmed.

## FACTS AND PROCEDURAL HISTORY

¶7. Randy and Brandie were married on June 21, 1997. The couple had three children, Ashlyn, who was sixteen years old as of trial, Allyson, who was fourteen years old as of trial, and Anna, who was twelve years old as of trial.

¶8. Randy and Brandie first separated when Brandie filed for divorce in November 2008. Brandie was in the midst of an affair with Johnny Rayburn and had become pregnant with his child. However, after Brandie left the marital home, Randy asked her to return. Brandie told Randy that she was pregnant and had been having an affair, but she lied to Randy and told him that she was having an affair with Michael Hall. In fact, Brandie never had a sexual relationship with Hall, who was married to one of her friends. Brandie testified that she lied to Randy about the identity of her paramour because she did not want to break up Rayburn's marriage and family. Brandie also testified that she thought that there was a slight chance that Randy could be the father of her child even though Randy had undergone a vasectomy years earlier. Randy told Brandie that he wanted their family to stay together, and he forgave her. Brandie gave birth to a son, Austin, and Randy and Brandie raised him as their own.[1]

¶9. During the marriage Randy worked for UPS and as a real estate appraiser. In 2010, he was injured on the job at UPS. He was prescribed several medications, including opiates, for pain from the injury and resulting nerve damage. He was also prescribed medications to

---

[1] Unbeknownst to Randy, Brandie took Austin for visits with Rayburn.

3

help him sleep and for anxiety and depression. In January 2013, Randy filed for Social Security disability benefits, and he was eventually approved for benefits retroactive to January 2012. In April 2015, Randy received lump sums of $40,666 for past due benefits due to him and $21,038 for past due benefits for his children. Randy claims that he spent the $40,666 to support himself and his family over the course of the next six months, but he produced no other evidence to substantiate that claim. Randy testified that the lump sum for his children was still in a bank account. In April 2015, Randy also began receiving monthly disability benefit payments of $1,329 for himself and $700 for his children.

¶10. After his injury, Randy was no longer able to work at UPS, but he continued to work as a self-employed real estate appraiser. He also leased residential properties through Thomas Properties LLC, as its sole member.[2] By the time of trial, Thomas Properties owned seven single-family homes and a trailer park with seven mobile homes.

¶11. Brandie worked as a real estate agent during the marriage. On her Rule 8.05 statement, she reported gross monthly income of $2,600.50. She had earned gross commissions of $79,240 in 2014, but her earnings decreased in 2015.

¶12. Brandie testified that Randy began abusing his painkillers while also drinking six to nine beers everyday in the shop behind their house. She testified that Randy liked to grill while he worked in the shop, but by dinner time he would be so intoxicated that he would drop trays of food on the ground and could not hold his eyes open at the dinner table. There

---

[2] At trial, Randy claimed that his father owned fifty percent of Thomas Properties. However, there is no evidence to support Randy's claim or to show that anyone else had any interest in the LLC. Randy's Schedule K-1 for 2013—the last year for which he produced tax documents—showed that he owned one hundred percent of Thomas Properties.

4

was also testimony that Randy was arrested at least three times[3] while under the influence of drugs and alcohol. In addition, Randy's mother had to call an ambulance after she found him lying unresponsive on her porch. Brandie testified that Randy's drinking habits negatively impacted the children. Their youngest daughter, Anna, would lock herself in her room and cry when Randy would become drunk and angry. Brandie had to limit when the children could have friends over because the children were embarrassed by Randy's outbursts.

¶13. On February 21, 2014, Randy was arrested and charged with domestic violence. The parties offered different versions of the events leading up to the arrest. Randy testified that he was up late doing appraisal work and watching television in the living room while Brandie was asleep in their bedroom with Allyson and Austin. Randy claimed that Brandie came into the living room, threw a remote control at him, and slapped him in the face. Brandie then ran to the couple's bedroom where Allyson and Austin were still sleeping, locked the door, and called 911. Randy then kicked down the bedroom door. Randy testified that, at that point, he realized that he had lost his temper, so he turned around and walked back to the living room. According to Randy, he then went outside and retrieved a gun that he kept in his truck. Randy testified that he typically kept his guns locked in a safe in his bedroom closet, but this particular gun was in his truck because he had recently "traded for it." He brought the gun back inside to inspect the gun's handle, which was cracked. According to Randy, he did not have the gun in his hand when he kicked down the bedroom door; rather, he

---

[3] Randy was arrested in February 2014 for domestic violence, in October 2014 for disorderly conduct after assaulting a police officer, and in February 2015 for violating a restraining order that prohibited him from going to the marital home.

retrieved the gun only after he kicked down the door.

¶14. Brandie testified that she was in the bedroom asleep with Allyson and Austin when she awakened to the sound of Randy "being loud in the living room." She said that it sounded like he was arguing with someone even though he was alone. Randy suddenly walked through the bedroom to the closet where he kept his gun safe. She heard the safe open, and Randy turned on the lights in the bedroom. He stood next to the bed with a gun and asked, "Where are the kids?" Brandie asked why he had a gun and asked him several times to put it down. Randy then turned away and walked back to the living room. Brandie retrieved her phone from the kitchen, ran back to her bedroom, locked the door, and called 911. Randy followed her, and when he realized that the bedroom door was locked, he became very angry and kicked down the door. When the police arrived, Randy was sitting in a chair in the living room with a loaded gun next to him on the coffee table. Brandie testified that she took Allyson and Anna to counseling as a result of the incident.

¶15. After Randy's arrest, Brandie filed for a domestic abuse protection order. The justice court granted a protection order and ordered Randy to vacate the marital home. Randy moved in with his parents, who lived nearby. Randy testified that he stopped using drugs and drinking alcohol after his arrest. In April 2014, the couple reconciled, and Randy moved back into the marital home with Brandie and their children.

¶16. The couple separated for a final time on October 21, 2014, when Brandie filed a complaint for divorce and a motion for temporary emergency relief. Officers arrived at the marital home around 8:30 p.m. on October 21, 2014, to serve Randy with a restraining order

6

and divorce papers. The officers' supervisor instructed them not to let Randy out of their sight because he was potentially dangerous and kept several guns in the home. When the officers arrived they explained to Randy that they "had a restraining order that was going to remove him from the house." According to the officers, Randy was angry but went to gather a few of his personal items. When he realized that the officers were following him, Randy told them to wait outside. The officers told Randy that they were under orders to not let him out of their sight. One of the officers testified that Randy "turned around angry and kind of butted me, you know, like, with his belly." Randy was arrested and pled guilty to disorderly conduct. He left the marital home and moved back in with his parents.

¶17. On November 19, 2014, the court entered an agreed temporary order. Brandie was granted temporary possession of the marital home and physical custody of the children. Randy was granted visitation every other weekend and ordered to pay $600 per month in temporary child support based on his reported income of $2,500 per month. The order stated that the temporary child support award could be adjusted retroactively based on later-presented evidence. The order also provided that Randy would remain under a restraining order and was not to have any contact with Brandie except for visitation and school and church activities involving the children.

¶18. In a pretrial deposition, Brandie admitted the truth about her affair with Johnny Rayburn, and Rayburn subsequently filed a motion to intervene for a determination of Austin's paternity. The court granted Rayburn's motion. On April 6, 2016, the parties agreed to an order regarding the custody and paternity of Austin. Rayburn was adjudicated

7

to be Austin's biological father. Brandie was granted physical and legal custody of Austin. Randy was granted visitation with Austin consistent with his visitation schedule with his daughters. The court dismissed Rayburn as a party but noted that he could pursue custody or visitation in a separate filing.[4]

¶19. On April 6, 2016, Brandie and Randy also consented to an irreconcilable differences divorce. They agreed to submit the issues of custody, visitation, child support, equitable division of the marital estate, contempt, and attorney's fees to the court for determination. The trial, which began with two days of testimony in November 2015, continued on the stipulated issues on April 6-7, 2016, April 11, 2016, and September 14, 2016.

¶20. Randy testified that he and Brandie shared parenting responsibilities prior to the separation. However, Brandie testified that she was primarily responsible for taking the children to school and extracurricular activities, shopping for their clothes, and helping them with homework. She testified that Randy occasionally helped her with such tasks.

¶21. Brandie testified that awarding Randy primary custody of their daughters would not be in the children's best interest because Randy never sought professional help for his drug and alcohol problems. Brandie opined that Randy was not sufficiently healthy or stable to be the children's primary caregiver. Brandie testified that she and her daughters have normal parent-child relationships. She also testified that her daughters may now prefer to live with Randy because he spends more money on them and spends more time with them now that he is sober. She noted that Randy had bought the girls a pet monkey since the separation.

---

[4] The court entered the agreed order on June 20, 2016, nunc pro tunc to April 6, 2016.

¶22. Ashlyn (age sixteen at the time of trial) testified that she preferred to live with Randy because she was very close to her father and they enjoyed the same activities. She testified that she loved both of her parents equally and that she was not angry with Brandie about her affair with Rayburn.

¶23. Anna (age twelve) also testified that she would prefer to live with Randy, although she acknowledged that her father drank excessively prior to the separation. Anna testified, "[M]om is so busy with her job, she's on the phone a lot, and she is like going out to show houses. And whenever we're with daddy, he's like playing games with us, and he's not like working on his job usually." Anna also testified that she had not seen Randy drink at all since her parents separated. She testified that Brandie was primarily responsible for taking care of her and her siblings.

¶24. Allyson (age fourteen) did not state a preference as to physical custody. She did testify that Brandie was primarily responsible for taking care of her and her siblings. All three daughters testified that they wanted to stay together with each other and Austin.

¶25. On January 24, 2017, the chancery court entered a final judgment granting the parties a divorce based on irreconcilable differences. Both parties filed post-trial motions, and on April 7, 2017, the court entered a ruling disposing of all pending post-trial motions. In the final judgment, as amended, the court awarded the parties joint legal custody of their three children, awarded physical custody of the children to Brandie, and granted Randy "extensive visitation"—including three weekends per month, alternate weeks in the summer, and specified visitation during spring break and holidays. The court ordered Randy to pay a child

9

support arrearage of $9,882, with interest to accrue at an annual rate of eight percent. The court ordered Randy to pay at least $500 per month toward the arrearage. The court also ordered Randy to pay $702.50 per month in continuing child support. The court's calculations with respect to Randy's child support obligations are discussed in more detail below.

¶26. The chancery court also classified and valued Randy and Brandie's property. The court classified two mobile homes as Randy's separate property. Randy had purchased the mobile homes as rental properties after the entry of an agreed temporary order. All of the parties' other assets were classified as marital property. The court awarded Brandie marital assets with a total net value of $379,771.64 and awarded Randy marital assets with a total net value of $384,313.68. Brandie was awarded the marital home, with a net value of $250,000, and twenty-eight percent of the value of Thomas Properties LLC. Randy was ordered to pay Brandie for her share of Thomas Properties ($113,074.64) within 180 days. Randy was awarded ownership of Thomas Properties, which was valued at $403,827.32, less Brandie's interest, for a net value of $290,755.68. Randy was also awarded his $40,666 lump sum payment from Social Security, which he claimed he had already spent.

¶27. Randy appealed, and Brandie cross-appealed. We have summarized their remaining disagreements above. *See supra* ¶¶2-5. For the reasons explained below, we affirm the chancery court's final judgment with two exceptions: we clarify ownership of an ATV and a motorcycle, and we remand for a recalculation of Randy's child support arrearage and disposition of the lump sum payment for the children's Social Security benefits.

ANALYSIS

## I.  Child Custody

¶28.  "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). Thus, on appeal in a child custody case, the issue is not whether this Court "agrees with the chancellor's ruling," but only whether "the chancellor's ruling is supported by credible evidence." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004).

¶29.  "[T]he polestar consideration in child custody cases is the best interest and welfare of the child." *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). In evaluating the child's best interest, the chancellor must consider the following factors: (1) the age, health, and sex of the child; (2) which parent had "continuity of care prior to the separation"; (3) "which has the best parenting skills"; (4) which has "the willingness and capacity to provide primary child care"; (5) both parents' employment responsibilities; (6) the "physical and mental health and age of the parents"; (7) the "emotional ties of parent and child"; (8) the "moral fitness of the parents"; (9) the "home, school and community records of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the "stability of the home environment and employment of each parent"; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Id.*

¶30. The chancellor must address each *Albright* factor that is applicable to the case. *Powell v. Ayars*, 792 So. 2d 240, 244 (¶10) (Miss. 2001). However, the chancellor need not decide that each factor favors one parent or the other. *Weeks v. Weeks*, 989 So. 2d 408, 411 (¶12) (Miss. Ct. App. 2008). Nor does *Albright* require that "custody . . . be awarded to the parent who 'wins' the most factors." *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012). "[T]he chancellor has the ultimate discretion to weigh the evidence the way [she] sees fit." *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003). We review the chancellor's application of the factors for manifest error, giving deference to the weight that she assigned to each factor. *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016).

¶31. In this case, the chancellor found that age, health, and sex of the children; the physical and mental health of the parties; parenting skills; and other factors relevant to the parent-child relationship favored Brandie. The chancellor found that the preferences of Ashlyn and Anna "strongly favor[ed]" Randy with respect to Ashlyn and Anna. The chancellor found other factors to be neutral and ultimately concluded that it was in the children's best interest for Brandie to have physical custody.

¶32. Randy argues that the chancellor "overemphasiz[ed]" his fault and unfairly "punished" him for his history of drug and alcohol abuse when considering the physical and mental health and moral fitness of the parties. Randy argues that the court's consideration of his prior conduct was inappropriate because he was no longer using drugs or alcohol at the time of trial. Randy also argues that he has better parenting skills than Brandie and a greater capacity to provide childcare. Finally, Randy argues that the chancellor erred by not

specifically stating on the record the reasons that she did not follow Ashlyn's and Anna's preferences. We address these arguments in turn but find no error or abuse of discretion in the chancellor's ruling.

### A. Physical and Mental Health of the Parties

¶33. The chancellor found that whereas Brandie is in good health, Randy has "ongoing issues" from his injury at UPS and "currently draws disability benefits." The court also found that Randy had "exhibited problems related to the use of alcohol or prescription medication," which had "contributed to troubling behavior by Randy." The court's findings are all supported by substantial evidence, and we find no error or abuse of discretion in the court's finding that this factor favors Brandie.

### B. Moral Fitness of the Parties

¶34. The chancellor found that Brandie's extramarital affair and her subsequent efforts to coverup the identity of Austin's father showed a high "level of deception." However, the chancellor also found that Randy's "[m]ultiple instances of bizarre and frightening behavior," fueled by drugs and alcohol, "severely troubled the home." The chancellor found that this factor favored neither party. We find no error or abuse of discretion. The chancellor was not required to make an apples-to-oranges comparison of the parties' respective misconduct or find that either of them "won" this factor. *See Weeks*, 989 So. 2d at 411 (¶12) ("[I]t is not necessary for [the chancellor] to state who prevails under each factor.").

### C. Parenting Skills and Willingness and Capacity to Provide Primary Childcare

¶35. The chancellor found that "Brandie provides excellent care for the children" and "has

consistently taken the lead" in attending to their "medical and educational needs." Indeed, there was substantial evidence that Brandie was heavily involved in the children's school, church, and extracurricular activities. The chancellor found that "Randy has also assisted with caring for the children, such as preparing dinner, helping with homework, transporting the children to school and assisting with field trips, and teaching the children to hunt and fish." The chancellor stated that this factor could "favor either parent at different times in the parties' involvement with the children, and overall very slightly favors Brandie." It was up to the chancellor as the finder of fact to weigh the conflicting evidence and decide which parent, if either, this factor favored. We find no manifest error or abuse of discretion in the chancellor's finding that it "very slightly favors Brandie."

### D.    The Children's Stated Preferences

¶36.    The chancellor found that this factor strongly favored Randy as to Ashlyn and Anna, who testified that they preferred to live with Randy, but favored neither party as to Allyson, who did not state a preference. Randy recognizes that the chancellor was not bound by the preferences of the children, but he argues that the chancellor's ruling did not comply with the requirements of Mississippi Code Annotated subsection 93-11-65(1)(a) (Rev. 2018).

¶37.    Prior to 2006, subsection 93-11-65(1)(a) provided that if both parents were fit and proper persons able to provide adequate care for the child, then a child twelve years of age or older would "have the *privilege* of choosing the parent with whom he [or should would] live." Miss. Code Ann. § 93-11-65(1)(a) (Rev. 2004) (emphasis added). Applying that version of the statute, our Supreme Court held that if a chancellor "denie[d] a child his choice

14

of custodial parent . . . , then the chancellor [was required] to make on-the-record findings as to why the best interest of the child [would not be] served" by the child's choice. *Polk v. Polk*, 589 So. 2d 123, 130 (Miss. 1991).

¶38.    In 2006, the Legislature eliminated the child's "privilege of choosing." *See* 2006 Miss. Laws ch. 431, § 1.  As amended, the statute provides that if both parents are fit and proper persons able to provide care, then "the chancellor *may consider* the preference of a child twelve . . . years of age or older." Miss. Code Ann. § 93-11-65(1)(a) (emphasis added). The amendments to the statute also codified the requirement that the chancellor "place on the record the reason or reasons for which the award of custody was made and explain in detail why the wishes of any child were or were not honored." *Id.*  Under the amended version of the statute, it is clear that "[t]he chancellor is not bound by the election of a minor child." *Boyd v. Boyd*, 83 So. 3d 409, 418 (¶31) (Miss. Ct. App. 2011).  Rather, the child's preference is but one factor that a chancellor "may consider."

¶39.    In this case, the chancery court's final judgment included a five-page *Albright* analysis with reasoning and specific findings for each factor.  The chancellor considered Randy's history of drug and alcohol use, his violent and unusual behavior, and his ability to care for the children.  The chancellor also considered Brandie's extramarital affair, her involvement in the children's daily lives, and the desire of the children to continue to live with their half-brother, Austin.  The chancellor also considered the preferences of Ashlyn and Anna.  The chancellor weighed these various factors and stated in the final page of her analysis:

> The Court takes into account that the three children share a half sibling,
> Austin, who is in the custody of Brandie.  The four children previously

> continually lived together as a family, and are very close. This factor favors keeping the children together.
>
> The Court also takes into account the prior incidents of volatile behavior by Randy. . . .
>
> Based on the Court's assessment of [the] totality of the circumstances as established by credible proof, with an emphasis upon the credibility of the witnesses, the Court concludes the best interest of the children shall be served by Brandie and Randy being awarded joint legal [custody] of the children with Brandie being awarded their physical custody and Randy receiving extensive visitation.

In addition, the chancellor's order on the parties' post-trial motions made clear that "the liberal visitation allowed to Randy was based largely on the testimony of the two children who desired to live with him."

¶40. We conclude that the chancellor's thorough analysis—which addressed all relevant factors, including the preferences of Ashlyn and Anna—is sufficient to satisfy section 93-11-65. The chancellor found, based on the "totality of the circumstances," that it was in the children's "best interest" for Brandie to have physical custody. However, the chancellor also awarded Randy liberal visitation in an effort to accommodate the wishes of Ashlyn and Anna. This was a sufficient statement of the chancellor's reasons for her decision to award custody to Brandie rather than to Randy. *See Bennett v. Bennett*, 242 So. 3d 210, 213 (¶¶12-14) (Miss. Ct. App. 2018); *Boyd v. Boyd*, 83 So. 3d 409, 418-19 (¶¶31-33) (Miss. Ct. App. 2011); *Phillips v. Phillips*, 45 So. 3d 684, 694 (¶¶30-31) (Miss. Ct. App. 2010). Accordingly, the chancellor's custody decision is affirmed.

## II. Visitation

¶41. "Visitation is a matter within the chancellor's sound discretion." *Carson v. Butler*,

16

168 So. 3d 1085, 1088 (¶14) (Miss. Ct. App. 2013) (quoting *Tidmore v. Tidmore*, 114 So. 3d 753, 763 (¶35) (Miss. Ct. App. 2013)). "The chancellor is charged with fashioning a visitation schedule that is in the best interests of the children, and the chancellor's visitation decision is afforded great deference by this Court." *Id.* In general, visitation with the noncustodial parent should be liberal rather than restricted. As this Court recently summarized,

> [e]xcept in unusual circumstances, a noncustodial parent is entitled to unrestricted standard or liberal visitation. Standard visitation includes two weekends a month until Sunday afternoon and at least five weeks of summer visitation, plus some holiday visitation. Awarding less is an abuse of discretion unless there is concrete proof of actual harm to a child. Appropriate visitation restrictions often relate to abusive behavior, drug or alcohol abuse, or mental illness.

*Michael v. Smith*, 237 So. 3d 183, 189-90 (¶26) (Miss. Ct. App. 2018) (citations, quotation marks, and brackets omitted).

¶42. On cross-appeal, Brandie argues that the chancellor erred by awarding Randy three weekends of visitation per month, rather than the standard two weekends. However, as noted above, the chancellor specifically stated that "the liberal visitation allowed to Randy was based largely on the testimony of the two children who desired to live with him." We find no abuse of discretion in the chancellor's decision to award an extra weekend a month of visitation to allow Ashlyn and Anna to spend more time with their father.

¶43. Brandie primarily argues that the chancellor should not have granted "extra" visitation in light of Randy's history of drug and alcohol abuse and bizarre and frightening behavior. However, Randy testified that he no longer uses drugs or alcohol, and the chancellor found

that Randy's "appearance and demeanor at trial, and the testimony of the children established [his prior] issues [with drugs and alcohol] appear to have been resolved." There is substantial evidence to support the chancellor's factual finding, and there is no evidence that an extra two days of visitation a month pose a risk of harm to the children.

### III. Child Support

¶44. "[A]n award of child support is a matter within the discretion of the chancellor and . . . will not be reversed unless the chancellor was manifestly wrong in his finding of fact or manifestly abused his discretion." *Williams v. Williams*, 264 So. 3d 722, 726-27 (¶12) (Miss. 2019) (quoting *Clausel v. Clausel*, 714 So. 2d 265, 266 (Miss. 1998)). "Furthermore, '[t]he process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains this Court's review.'" *Id.* at 727 (quoting *Clausel*, 714 So. 2d at 266-67). Randy and Brandie both challenge the chancellor's rulings on child support. Randy argues that the chancellor set his obligation too high, while Brandie argues that the chancellor did not award sufficient support. Brandie also argues that the chancellor erred by granting Randy credit against his child support arrearage for the lump sum that he received for Social Security benefits for the children. We address the parties' respective arguments below.

### A. Randy's Arguments

¶45. Randy argues that the chancellor overstated his adjusted gross income for purposes of calculating child support by overstating his income from various sources and by failing to deduct the "ordinary and reasonable business expenses" of Thomas Properties. Randy

18

argues that this resulted in an overstatement of both his child support arrearage and his prospective child support obligation. However, Randy concedes that the record regarding his income from various sources and related expenses is "extremely unclear." Randy admitted at trial (in April 2016) that he had not filed a personal income tax return since his 2012 return, and Thomas Properties had not filed a return since its 2013 return. In addition, Randy had received social security disability payments for several years even while he earned substantial sums from real estate appraisals and his rental properties.[5] Finally, although Randy complains that the chancellor did not give him credit for his business expenses, such as property taxes, he concedes that "[t]he [r]ecord is silent as to the precise amount and nature of [his] expenses." For the reasons discussed below, we conclude that the chancellor did not commit any clear error; rather, the chancellor made a reasonable estimate of Randy's adjusted gross income in light of the limited evidence that Randy presented.

¶46.    Randy submitted his first Rule 8.05[6] statement in November 2014. He stated that he worked as a self-employed real estate appraiser, and he claimed that his income was $3,083 per month. He disclosed no "Rental Income." Randy signed a second Rule 8.05 statement on November 5, 2015. He disclosed disability benefits of $1,340 per month and income of $2,300 per month from Thomas Properties based on $3,500 per month in receipts less $1,200 in "expenses from checkbook." Randy's second Rule 8.05 statement showed no income from real estate appraisals, although he continued to show his occupation as a self-employed

---

[5] Randy testified that his rental income did not affect his Social Security benefits because it was "passive income."

[6] *See* UCCR 8.05.

19

appraiser. Randy submitted a third Rule 8.05 statement on November 15, 2015, that made the same disclosures with respect to his income.

¶47. At trial, Randy admitted that he earned far more than was reflected in his Rule 8.05 statements. Specifically, on cross-examination in April 2016, Randy agreed that he received approximately $6,800 per month in rental income, approximately $3,083 from real estate appraisals, and approximately $1,350 in social security disability benefits for a total monthly income of approximately $11,233. Randy also gave conflicting testimony that he paid his father to do some of his appraisals, and on the final day of trial Randy claimed that he no longer did *any* appraisals.

¶48. In the final judgment, the chancellor agreed with Brandie's position, as stated in her post-trial brief, that Randy had an adjusted gross income of $9,700 per month.[7] However, the chancellor revisited the issue in her subsequent order on the parties' post-trial motions and concluded that Randy's adjusted gross income should be revised. The chancellor found that "[w]hile the proof may have been unclear and conflicting concerning Randy's deductions and expenses, it is fair to presume that he has some, though undetermined, expenses for the operation of his business." Therefore, the chancellor found that Randy's adjusted gross income should be revised to $8,500.

¶49. On appeal, Randy complains that the chancellor used an "arbitrary" figure for his business expenses rather than his actual expenses. However, Randy's argument is without

---

[7] Brandie's post-trial brief is quoted in the chancery court's final judgment but is not part of the record. In her subsequent motion to amend her motion to alter or amend the judgment, Brandie reiterated that Randy's income was $9,700 per month.

merit given his failure to present evidence of his actual expenses. Moreover, the $1,200 credit that the chancellor gave Randy for business expenses matches the $1,200 in expenses shown in Randy's own Rule 8.05 statements. The chancellor must make findings based on the evidence presented by the parties, even if it is less than ideal. *Pruitt v. Pruitt*, 144 So. 3d 1249, 1252-53 (¶11) (Miss. Ct. App. 2014). Having failed to present evidence of his actual expenses, Randy cannot complain that the chancellor used a figure found in his own Rule 8.05 statements.

¶50. Randy also alleges that the chancellor overstated his income. However, the chancellor simply made findings of fact based on Randy's own conflicting testimony. For instance, Randy argues that the chancellor should have accepted his claim, made on his final day of his trial testimony, that he no longer performed any real estate appraisals. However, the chancellor was entitled to credit Randy's prior sworn Rule 8.05 statement and testimony that he earned approximately $3,083 per month on appraisals. The chancellor was not required to accept Randy's self-serving and uncorroborated testimony that he had stopped doing appraisals. Accordingly, the chancellor did not clearly err by finding that Randy's adjusted gross income for purposes of calculating child support was $8,500 per month.

### B. Brandie's Arguments

¶51. Based on the chancellor's finding that Randy's monthly adjusted gross income was $8,500, the statutory child support guidelines called for Randy to pay child support of $1,870 per month. *See* Miss. Code Ann. § 43-19-101(1) (Rev. 2015) (establishing a rebuttable presumption that twenty-two percent of the payor's adjusted gross income should be awarded

21

for the support of three children). However, the chancellor found that Randy's annual adjusted gross income exceeded $100,000 and that the guidelines should not be "controlling." *See id.* § 43-19-101(4). The chancellor then concluded that Randy's obligation should be reduced by twenty-five percent (to $1,402.50 per month) "based on the additional time the children shall spend with him." The chancellor also credited Randy for the $700 per month in Social Security benefits that the children would receive on account of his disability. Therefore, the chancellor ordered Randy to pay $702.50 per month in child support.

¶52. Brandie argues that the chancellor committed three errors in calculating Randy's monthly child support obligation. Specifically, Brandie argues that the chancellor (1) understated Randy's adjusted gross income, (2) erred by reducing Randy's child support obligation to account for his additional visitation, and (3) erred by giving Randy credit for Social Security benefits for the children. Brandie also argues that the chancellor erred by giving Randy credit against his arrearage for the lump sum payment that he received for past due Social Security benefits for the children. We address these arguments in turn.

### 1.    Randy's Adjusted Gross Income

¶53. Brandie first argues that the chancellor should have found that Randy's adjusted gross income was $12,333. Brandie relies on (a) Randy's April 2016 testimony on cross-examination that he received approximately $11,233 from various sources and (b) Randy's testimony that he had purchased two additional mobile homes that he hoped to fix up and rent. Brandie assumes that Randy will find tenants who will pay $550 per month for the two

22

mobile homes (the same rent that Randy charged for his other five mobile homes).

¶54. We conclude that Brandie's arguments fail for the same basic reasons as Randy's arguments on this same issue. The chancellor's finding that Randy has an adjusted gross income of $8,500 per month is a reasonable interpretation of the conflicting evidence presented at trial. The chancellor reasonably credited Randy for some business expenses related to his rental properties, even if Randy's proof was less than ideal. The chancellor also could have credited Randy's testimony that he was performing fewer appraisals than before, even if she did not believe his last-day-of-trial testimony that he no longer performed any appraisals. Finally, the chancellor was not required to assume that Randy would receive rental income on mobile homes that he had not yet rented. *See Harden v. Scarborough*, 240 So. 3d 1246, 1256 (¶28) (Miss. Ct. App. 2018) (holding that the chancellor was not required to predict a payor's future income based on parties' predictions of uncertain future events). Given the conflicting evidence and testimony presented, we cannot say that the chancellor committed any clear error in estimating Randy's adjusted gross income.

## 2. Reduction for Additional Visitation

¶55. The chancellor deviated from the guidelines and reduced Randy's monthly support obligation by $467.50 based on the fact that the children would be spending more than one-quarter of their time with him. Brandie argues that the chancellor erred in making this reduction. However, we find no error or abuse of discretion.

¶56. As noted above, the chancellor found that Randy's annual adjusted gross income exceeded $100,000 and that the guidelines should not be "controlling" in this case. *See* Miss.

23

Code Ann. § 43-19-101(4). Moreover, the guidelines are "not absolute rules" in any case, *Dunn v. Dunn*, 911 So. 2d 591, 600 (¶27) (Miss. Ct. App. 2005), and the statute recognizes that a deviation from the applicable guideline may be appropriate if "the noncustodial parent spends a great deal of time with the children." Miss. Code Ann. § 43-19-103(g) (Rev. 2015).

¶57. In this case, Randy will incur somewhat greater expenses by having his daughters three weekends every month during the school year, while Brandie's expenses should be somewhat reduced by Randy's additional visitation. Moreover, Randy should have visitation with Austin while he has visitation with his daughters, which will add to his expenses and reduce Brandie's expenses. Under the circumstances, we cannot say that the chancellor manifestly erred or abused her discretion in "weighing [the] evidence and arriving at an award." *Williams*, 264 So. 3d at 727 (¶12) (quoting *Clausel*, 714 So. 2d at 266-67).

### 3. Credit for Social Security Disability Payments

¶58. Brandie next argues that the Randy should not receive a dollar-for-dollar credit against his child support obligation for the Social Security benefits paid to their children on account of Randy's disability. Brandie concedes that the chancellor's decision was consistent with prevailing Mississippi Supreme Court precedent holding that a parent is entitled to such a credit against child support for Social Security benefits paid for a child on account of the parent's disability. *Mooneyham v. Mooneyham*, 420 So. 2d 1072, 1073-74 (Miss. 1982); *Keith v. Purvis*, 982 So. 2d 1033, 1036 (¶8) (Miss. Ct. App. 2008). However, Brandie asks us to "carve out an exception to the normal rule for unusual cases in which the 'disabled person' is making a substantial amount of money over and above his disability payments."

24

¶59. We decline to "carve out an exception." *Mooneyham* does not suggest that there are any exceptions to the rule that the Court announced in that case, and we are bound to follow Supreme Court precedent. Moreover, the Supreme Court's recent discussion of *Mooneyham* is instructive. In *Harris v. Harris*, 241 So. 3d 622 (Miss. 2018), the Court distinguished *Mooneyham* and held that a former spouse's receipt of Social Security retirement benefits based on the earnings history of the other former spouse is not "a special circumstance triggering an automatic reduction in *alimony*." *Id.* at 628 (¶19) (emphasis added). However, the Court concluded its opinion by stating: "To be clear, the instant holding separates Social Security benefits that affect alimony from Social Security benefits that affect child support, *and the caselaw regarding Social Security benefits that affect child support is not changed by this holding*." *Id.* at 629 (¶21) (emphasis added). Thus, *Mooneyham*'s holding remains good law. The chancellor did not err by granting Randy credit for Social Security benefits paid to his children on account of his disability.

### 4.    Randy's Child Support Arrearage

¶60. The chancellor's final order found that Randy had accrued a child support arrearage of $30,920. This figure represented the difference between (a) what Randy actually paid under the agreed temporary order and (b) what he should have paid based on the calculations in the court's final order.[8] Brandie argues that this figure is too low because the chancellor understated Randy's income, while Randy argues that it is too high because chancellor overstated his income. However, we have already concluded that the chancellor's

---

[8] As noted above, the agreed temporary order expressly stated that the temporary child support award could be adjusted retroactively based on evidence subsequently presented.

determination of Randy's adjusted gross income was not clearly erroneous. Therefore, the parties' arguments related to Randy's income require no further discussion.[9]

¶61. Brandie also argues that the chancellor erred by granting Randy a credit against the arrearage in the amount of $21,038 for the lump sum payment of past due Social Security benefits for their children. Randy received this payment in April 2015 for benefits due for the period of January 2012 to March 2015.[10] At trial, Randy testified that he deposited this money in a bank account and that he still had it. The chancellor ordered Randy to pay the money to Brandie in exchange for a credit against his child support arrearage, thereby reducing the arrearage to $9,882. The chancellor's final order provided that the arrearage would accrue interest at an annual rate of eight percent. The chancellor ordered Randy to payoff the arrearage in installments of at least $500 per month.

¶62. The chancellor did not err by granting Randy a credit against the arrearage. As the chancellor correctly recognized, Mississippi law now requires such a credit. *See* Miss. Code Ann. § 93-11-71(6) (Rev. 2018).[11] However, we also hold that Randy was not entitled to a

---

[9] Randy also argues that he is entitled to a credit for paying one-half of the utilities on the marital home pursuant to the agreed temporary order. However, Randy cites no authority for this argument, so the issue is waived. *See, e.g.*, *Simmons v. State*, 805 So. 2d 452, 487 (¶90) (Miss. 2001) ("Failure to cite relevant authority obviates the appellate court's obligation to review [the alleged error]."). Moreover, under the terms of the agreed order, Randy's obligation to pay one-half of the utilities was separate from his obligation to pay child support. The agreed order did not provide that Randy's utility payments would be counted as child support or credited against any future determination of an arrearage.

[10] The benefits were for all four children, including Austin.

[11] The Legislature added this provision in 2011, *see* 2011 Miss. Laws ch. 530, § 2, apparently in response to this Court's decision in *Chapman v. Ward*, 3 So. 3d 790, 795-99 (¶¶14-29) (Miss. Ct. App. 2008), which held that a parent was not entitled to a credit against

26

*full* credit against his arrearage because most of his arrearage accrued *after* Randy had already received the lump sum payment.

¶63.    Mississippi Code Annotated subsection 93-11-71(6), which was enacted in 2011, provides:

> A parent who receives social security disability insurance payments who is liable for a child support arrearage and whose disability insurance benefits provide for the payment of past due disability insurance benefits for the support of the minor child or children for whom the parent owes a child support arrearage shall receive credit toward the arrearage for the payment or payments for the benefit of the minor child or children if the arrearage accrued after the date of disability onset as determined by the Social Security Administration.

Miss. Code Ann. § 93-11-71(6).  Thus, using the present tense, the statute provides that a "parent who *receives*" a payment of past due benefits and "who *is* liable for" and "*owes* a child support arrearage shall be entitled to a credit toward *the arrearage*."  *Id.* (emphasis added).  We interpret this language to permit a credit only against "the arrearage" that the parent "is liable for" and already "owes" *at the time he "receives" the lump sum payment for past due benefits*.  *Id.* (emphasis added).  The plain language of the statute does not allow a parent, like Randy, to hold onto the children's benefits to use as a credit against his own *future* failures to pay child support.

¶64.    As stated above, the $21,038 payment that Randy received was for past due benefits for his minor children for the period of January 2012 to March 2015.  However, Randy and Brandie did not finally separate until October 2014, and Randy was not under a court order to pay temporary child support until November 2014.  Thus, Randy is not entitled to a credit

a child support arrearage for a lump sum payment of past due benefits.

for the past due benefits that he received for the children for the thirty-four months from January 2012 through October 2014. During that period, Brandie and Randy presumably jointly supported the children with marital funds—including income earned by both parties. Therefore, the past due benefits for that thirty-month period were, in effect, a reimbursement of expenditures that the couple paid for the children out of marital funds. Those benefits should be treated as ordinary marital property, subject to equitable division. On the other hand, Randy is entitled to a credit for the arrearage that he accrued during the five months from November 2014 to March 2015 that he was under a court order to pay support.

¶65.   We reverse and remand the case solely for the chancellor to determine the proper allocation and disposition of the $21,038 lump sum payment for past due benefits for the children. The chancellor should first determine the credit that Randy is entitled to for past due benefits that were paid for the five months from November 2014 to March 2015. That amount should be paid to Brandie immediately in exchange for a credit to Randy against his arrearage. The remainder of the lump sum is a marital asset and should be divided by the chancellor based on ordinary principles of equitable division. Given that this asset represents only a small fraction of the entire marital estate, we affirm and leave in place the remainder of the chancery court's judgment and division of the marital estate. We remand solely for the chancellor to redetermine Randy's credit and child support arrearage and the proper division of the remainder of the lump sum.

### IV.    Equitable Division

¶66.   "[A]n equitable division of property does not necessarily mean an equal division of

28

property." *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994). "[T]he goals of equitable distribution are a fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Seymour v. Seymour*, 960 So. 2d 513, 519 (¶15) (Miss. Ct. App. 2006). Our Supreme Court has "direct[ed] the chancery courts to evaluate the division of marital assets" based on a non-exclusive list of factors (the "*Ferguson* factors") and "to support their decisions with findings of fact and conclusions of law for purposes of appellate review." *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994). Although the chancellor is required to consider the *Ferguson* factors, "[t]he equitable distribution of marital assets is committed to the discretion of the chancellor, whose findings will not be disturbed by this Court unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Arthur v. Arthur*, 691 So. 2d 997, 1003 (Miss. 1997).

¶67. In this case, the chancellor expressly addressed each *Ferguson* factor in the course of equitably dividing the marital estate. Neither party challenges the chancellor's application of these factors. However, Randy argues that the chancellor erred in classifying his lump sum payment for past due disability benefits as a marital asset and by awarding that asset to him. He also argues that the chancellor erred in her classification of a trailer park and mobile homes owned by Thomas Properties. Finally, he argues that the chancellor erred in her valuation of a "Honda Rhino motorcycle." We will address these arguments in turn.

### A. Randy's Disability "Back Pay"

¶68. Randy argues that the chancellor "erred by awarding [him] the sum of $40,666 in the

equitable distribution, representing his previous social security disability back-pay award, when that money was depleted before trial and there was no evidence of a wasteful dissipation." However, we find no error or abuse of discretion.

¶69. Randy received his back pay award around April 27, 2015, but he claims that it was all gone by the time that trial began November 5, 2015. During that approximately six-month period, Randy was receiving substantial rental income as well as $1,329 per month in disability benefits. There is also evidence that he was earning additional income from real estate appraisals. At the same time, Randy should have had relatively few living expenses. He was living rent-free with his parents, and he was not providing medical insurance for his children, as they were then covered by the Children's Health Insurance Program (CHIP). Moreover, Randy was not even paying child support during this period because he stopped doing so in April 2015 in reliance on Brandie's receipt of monthly Social Security benefits for the children on account of his disability. In short, while Randy claimed that he spent his entire "back pay" award prior to trial, he was unable to articulate how or produce any evidence to document his alleged expenditures. The only specific, significant expenditure that he was able to point to was his purchase of a pet Marmoset monkey for $3,800.

¶70. "The use of marital funds to pay legitimate and reasonable living expenses of both spouses during a separation does not necessarily amount to dissipation." *Leblanc v. Leblanc*, No. 2017-CA-00600-COA, 2018 WL 5262584, at *7 (¶48) (Miss. Ct. App. Oct. 23, 2018). However, Randy failed to show that he actually spent these funds between April 2015 and November 2015. He certainly did not show that he spent the funds on reasonable or

30

legitimate living expenses. We find no error or abuse of discretion in the chancellor's implicit finding that the funds had not been depleted.

### B. Mobile Home Park

¶71. On March 1, 2014, Randy contracted to purchase Cedar Creek Mobile Home Park for $80,000. Randy made a down payment of $17,500 and agreed to pay the balance through sixty monthly payments of $1,179.45, with the first payment due on March 1, 2014. The contract also gave Randy the option of paying off the balance early without penalty. The contract stated that as of March 1, 2014, Randy was assuming "possession and all liabilities" of the trailer park. Randy's trial testimony on this subject was vague, and he was unable to recall dates or details related to the transaction. Nonetheless, it appears that he paid the entire purchase price ($80,000) by January 30, 2015, when a deed was recorded conveying the property to Thomas Properties. Indeed, Randy seemed to testify that he finished paying the balance in October 2014 but the "final paperwork" was delayed a few months.

¶72. Randy argues that the chancellor erred by failing to establish a line of demarcation for purposes of classification of property as marital or non-marital. Randy further argues that because he did not finally "acquire[] the mobile home park" until after entry of the temporary order, it should have been classified as non-marital property, at least in part.

¶73. We disagree. The record simply does not support Randy's argument on appeal. Randy's vague testimony failed to establish whether he finished paying off the trailer park before or after the parties' final separation or the temporary order. Moreover, the chancellor did specifically find that "two trailers acquired for the trailer park . . . were . . . separate

31

property due to their being purchased after the temporary order." By implication, the chancellor simply found that Randy failed to meet his burden of proving that the trailer park and its five other mobile homes were separate property. *See Serio v. Serio*, 203 So. 3d 24, 31 (¶21) (Miss. Ct. App. 2016) ("Because assets owned by a spouse are presumed to be marital property, the party seeking to classify property as separate, or non-marital, bears the burden of tracing the asset to a separate-property source." (quoting *Allgood v. Allgood*, 62 So. 3d 443, 447 (¶13) (Miss. Ct. App. 2011))). We find no error or abuse of discretion in the chancellor's classification of the trailer park and five mobile homes.

### C. The Rhino ATV and the Honda Motorcycle

¶74. Both parties' pretrial Rule 8.05 statements listed a "Rhino" all-terrain vehicle, and the parties agreed that it was worth $5,000. Randy also has a Honda motorcycle that was included on a list of the parties' assets at trial. Randy testified that his motorcycle was worth about $1,000. In the final judgment, the chancellor mistakenly awarded Brandie a "Honda Rhino Motorcycle" valued at $1,200 but did not award an ATV to either party. It appears that the chancellor simply conflated these two vehicles. On appeal, the parties agree that Brandie should receive the Rhino ATV, while Randy should receive the motorcycle.

¶75. Despite the parties' agreement as to who should receive which vehicle, Randy emphasizes that the error resulted in an understatement of the total net value of Brandie's assets, and he argues that we must reverse and remand for the chancellor to reevaluate the entire equitable division of the marital estate. We disagree that reversal is warranted. The judgment purported to award Brandie assets with a net total value ($379,771.64) that was

32

slightly less than the net total value of the assets awarded to Randy ($384,313.68). There is nothing in the judgment to suggest that the chancellor attempted to give the parties mathematically precise percentages of the marital estate. If we simply modify the judgment to award Brandie the Rhino ATV at its agreed value of $5,000 and to award Randy the Honda motorcycle at a value of $1,000, then the total net value of Brandie's assets will still be slightly less than the total net value of Randy's assets—$383,571.64 for Brandie and $385,313.68 for Randy. The chancellor's error is immaterial to the property division as a whole, and there is nothing to suggest that the correction of this error would impact anything else in the property division or the judgment as a whole. *See Inge v. Inge*, 227 So. 3d 1185, 1190 (¶17) (Miss. Ct. App. 2017) (finding an error in the chancellor's judgment harmless when there was "no indication that [it] impacted [the chancellor's] ultimate decision"). Accordingly, we conclude that the error was harmless, and we simply modify the judgment of the chancery court to correct the error. Brandie gets the Rhino ATV; Randy gets his motorcycle.

## V. Income Tax Exemptions

¶76. The chancellor found that Brandie and Randy should alternate receiving the income tax dependency exemptions for the children. The final judgment provided that in even-numbered years beginning with 2016, Brandie can claim Ashlyn and Allyson as dependents, while Randy can claim Anna; and in odd-numbered years beginning with 2017, Randy can claim Ashlyn and Allyson, while Brandie can claim Anna.

¶77. Brandie argues that the chancellor erred by awarding Randy one-half of the

33

dependency exemptions for the minor children because he pays only $702.50 per month in child support and admitted at trial that he had not filed a personal income tax return since 2012. However, we cannot say that the chancellor manifestly erred or abused her discretion in awarding the exemptions. *See Louk v. Louk*, 761 So. 2d 878, 883-84 (¶¶15, 19) (Miss. 2000) (reviewing the chancellor's award of dependency exemptions for manifest error or abuse of discretion).

¶78. Our Supreme Court has stated that the "[i]ncome of the spouses is not the only factor that should be considered in determining who should be awarded the tax exemptions, especially considering the non-economic but nevertheless valuable contributions contributed by the custodial parent." *Id.* at 884 (¶17). Other potentially relevant factors that the Court identified include:

> (1) the value of the exemption at the marginal tax rate of each parent; (2) the income of each parent; (3) the age of the child(ren) and how long the exemption will be available; (4) the percentage of the cost of supporting the child(ren) borne by each parent; and (5) the financial burden assumed by each parent under the property settlement in the case.

*Id.* (citing *Glover v. Torrence*, 723 N.E.2d 924, 938 (Ind. Ct. App. 2000)). The Court stated that "a [c]hancellor would be well-served to consider these factors where appropriate." *Id.* at (¶18). However, there is no requirement that the chancellor make specific findings to support an award of tax exemptions. Indeed, the Court stated that "many cases do not involve incomes or estates significant enough to justify this type of analysis." *Id.*; *accord Laird v. Blackburn*, 788 So. 2d 844, 852-53 (¶¶16-17) (Miss. Ct. App. 2001).

¶79. In this case, the chancellor did not make any findings of fact related to the dependency

34

tax exemptions, but "when there are no specific findings of fact, this Court will assume that the trial court made determinations of fact sufficient to support its judgment." *Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 367 (Miss. 1992). That is, "[w]here there are no specific findings of fact provided by the chancellor, this Court must look to the evidence and see what state of facts will justify the decree." *Id.* Randy has a higher income than Brandie, so the tax exemptions should be worth more to him—assuming that he starts filing tax returns again. In addition, Randy exercises visitation with the children that is more than standard visitation, and he pays child support. Finally, we note that because Brandie can claim an exemption for Austin, she will be able to claim at least two exemptions every year. On these facts, we cannot say that the chancellor clearly erred or abused her discretion by evenly dividing the dependency deductions for the parties' three minor children.

### VI. Attorney's Fees

¶80. In the final judgment, the chancellor awarded Brandie $1,000 in attorney's fees based on Randy's contempt of court,[12] but the chancellor otherwise denied the parties' requests for attorney's fees, finding that "neither party demonstrated an inability to pay his or her attorney's fees." On cross-appeal, Brandie argues that the chancellor "erred by not awarding [her additional] attorney's fees in light of Randy's initially-accomplished fraud upon the court, and his multiple attempts to work a fraud upon the court thereafter, which greatly increased Brandie's attorney's fees."

---

[12] The contempt apparently related to Randy's February 2015 violation of the restraining order against him. *See supra* n.3. On appeal, neither party challenges the award of fees for contempt.

¶81. Brandie's argument is without merit. Although Randy filed Rule 8.05 statements that understated his income, there is no proof in the record of the amount of attorney's fees, if any, that Brandie incurred as a result. Moreover, on the final day of trial, Brandie testified that she was not asking for her attorney's fees to be reimbursed. We review the denial of attorney's fees for an abuse of discretion. *Erickson v. Smith*, 909 So. 2d 1173, 1182 (¶24) (Miss. Ct. App. 2005). In the absence of any proof of the amount of attorney's fees that Brandie incurred as a result of Randy's alleged fraud, the chancellor did not abuse her discretion by denying Brandie's request for fees. *Id.* at (¶26).

## CONCLUSION

¶82. We affirm the final judgment of the chancery court with only two exceptions: First, the judgment is modified to reflect that Brandie is awarded the Rhino ATV and Randy is awarded his Honda motorcycle. Second, the case is remanded for the chancery court to recalculate the amount of Randy's credit against his child support arrearage based on the past due Social Security benefits for the children. Randy is entitled to a credit only for the part of the April 2015 lump sum payment that reflects benefits paid for the period when Randy was under a court order to pay child support (November 2014 through March 2015). Randy shall immediately pay that amount to Brandie in exchange for a credit against his arrearage. The remainder of the lump sum is a marital asset that the chancellor should then divide based on ordinary principles of equitable division. All other provisions of the chancery court's property division and final judgment are affirmed.

¶83. **ON DIRECT APPEAL: AFFIRMED AS MODIFIED. ON CROSS-APPEAL:**

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**